EAST ET AL. *v.* SKELLY

[No. 182, October Term, 1954.]

*Decided June 22, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*W. Lee Harrison* and *Richard C. Murray,* with whom was *Douglas G. Bottom* on the brief, for appellants.

*Solomon B. Levin,* for appellee.

HAMMOND, J., delivered the opinion of the Court.

A free lance jockey, injured while riding in a race at Laurel, was held to be a casual employee and denied compensation by the State Industrial Accident Commission. The Circuit Court for Prince George's County, sitting without a jury, reversed on the evidence which was before the Commission, finding that the jockey was an employee entitled to compensation. The employer and insurer appealed.

The significant facts are not in dispute and the case turns on questions of law. The evidence discloses that there are two methods used by owners and trainers of race horses for procuring the services of jockeys. One, less often used, is to employ a jockey under contract to ride any horse the employer designates; the other, the more common, is to use one of the pool of free lance jockeys, who are ready to ride for any owner or trainer who engages their services for a particular race. The racing secretary of the track arranges races a week or ten days in advance and the owner or trainer, who has a horse eligible for any of the races, arranges with the agent of a jockey—each has one—for his boy to ride that horse. It is not necessary to designate a jockey for a horse until eight o'clock of the morning of the day of the race, and employment usually is arranged the afternoon of the day before the race, although if a horse

and a jockey are deemed unusually compatible, it may be as much as ten days before. Compensation for the ordinary race is standard. The jockey receives $20.00 in any event. If the horse he is riding runs second or wins, he receives $35.00 or $50.00, as the case may be. The $20.00 is paid to the bookkeeper of the race track, who collects it in the paddock before the race. If the horse runs second or wins, the additional $15.00 or $30.00 is deducted from the purse and paid to the jockey. The owner or trainer does not either hire the jockey directly or pay him directly. The jockey does not appear on his payroll or on any records kept by him. Periodically, the track prepares and furnishes the owners and trainers a statement, showing payments made to the jockeys. The owner or trainer does not pay social security on a jockey. The jockey makes his own contributions.

Skelly, the appellee, has had fourteen years experience as a jockey and earns some $20,000 a year. In the six or seven months preceding the accident, he had ridden about twenty-five times a week. Ten or twelve of these races had been for East, an appellant who conducted a public stable, all on the same basis as the race here involved. Thus, Skelly had ridden for East in approximately two per cent of all of the races he had ridden in that period. Skelly also rode for many other owners and trainers. He testified that he had been engaged to ride one or more of East's horses in the week or ten days after the accident. East denied this, saying that he did not engage any jockey prior to the day before a race, and specifically emphasized that he had not employed Skelly for any future races. When asked how he came to engage Skelly for the race in which the jockey was injured, East said that he "* * * had a horse then, didn't have a rider, and those jockeys employ agents, and his agent came to me to get the mount for Skelly and I told him all right." He said it was either the same day Skelly was injured or the day before, probably the day before. As was usual, he did not see Skelly until just before the race when the horses were in the paddock,

when it is customary to tell the jockey how the horse runs best. East added that he had not had a contract jockey for some years and that it was his practice to use free lance jockeys. None of the free lance jockeys who rode for him was on his payroll nor did he keep any records on their employment or remuneration, relying entirely on the data furnished by the track. He did keep payroll and other records of his employees, such as exercise boys, grooms, stable boys and so-called "hot walkers". He also kept records on contract riders when he employed them. He stated that he did not pay any premiums to his Workmen's Compensation carrier on free lance jockeys. When asked whether he submitted the race track records to the representative of the insurance company who made the annual audit of his accounts on which the premiums of the compensation policy were based, East's reply was: "No sir. The insurance man has only requested the records from me of my own payroll." He added that he had never kept any record of any jockey except those under contract to him, nor had he paid compensation premiums on them. It is agreed that Code, 1951, Art. 101, Sec. 66, is not applicable.

In *Moore v. Clarke,* 171 Md. 39, this Court reviewed the cases and considered the arguments made by the appellee in the case at bar, and held flatly that a free lance jockey was a casual employee. Therefore, unless *Moore v. Clarke* is to be over-ruled, or is to be distinguished on the facts, or has been made inapplicable by changes in the statute, that decision controls the case before us. The appellee contends that in *Moore v. Clarke,* the opinion suggests that the jockey was employed to ride for only a single race which had no relationship to past or future employment by the same trainer, whereas, in the present case, Skelly had ridden for East some ten or twelve times and was prevented by the injury from riding in the future for him. The lower court fell into the error of adopting this interpretation of the earlier case, saying that the employment of the jockey in *Moore v. Clarke* had been "connected with no past or future em-

ployment". The court added: "While this court recognizes some similarity between the facts in the Clarke case and the facts here, it finds that the Clarke case is distinguishable and should not govern the determination of whether or not Skelly was a casual employee." Overlooked by the appellee and the trial court is the fact that the testimony in the record in the case of *Moore v. Clarke* shows that there is complete analogy between the significant facts of that case and those of the instant case. The jockey in the earlier case was a contract rider for a well known trainer of a public stable. As is usually the case, he was free to ride in any race in which his employer did not have a horse entered. In the race in which he was killed, he was doing that, and riding for a trainer for whom he had ridden a number of times during that meet and for whom, but for the accident, he would have presumably ridden in the future. The methods of employment, the methods of payment and all significant facts are the same in the two cases. Incidentally, the only difference is in the amount of the fee of the free lance jockey. In the earier case, the standard fee was $10.00, win, lose or draw, with $20.00 for the jockey of a winner. Inflation has now raised the basic fee to $20.00 and the winner's fee to $50.00.

We turn then to the consideration of whether the amendment to the compensation law, made by Chapter 839 of the Acts of 1947, changes the result. It added a new sub-section (45A) to Code, 1951, Art. 101, Sec. 20, by which were included in employments defined as extra-hazardous by the statute, those of: "All persons employed by the owners or trainers of horses who participate in the conduct of racing at any track licensed under Article 78B of the Annotated Code of Maryland." It is clear that the Court decided in *Moore v. Clarke* that the work of a jockey was extra-hazardous, and so came under the omnibus clause of Sec. 20, sub-section (46), which makes the Act cover all employments not enumerated which are extra-hazardous in fact. The lower court was inconsistent as to the effect of the 1947 amendment.

First, it observed that the amendment "* * * did not have the effect of bringing free lance jockeys within the coverage of the Act if they should be held to be merely casual employees." It then decided, however, that: "It is reasonable to assume that the Legislature, in adding sub-section 45A, had in mind the decision in *Moore v. Clarke,* and intended to bring within the coverage of the Act the majority of the jockeys who are employed as free lance riders rather than only the unusual and extraordinary contract riders." We think the observation of the lower court, rather than its holding, to be correct. The amendment to Sec. 20, here involved, was made some eleven years after the decision in *Moore v. Clarke.* This lapse of time would rather negate any direct connection between the decision in that case and the amendment in the law. We think the amendment does not indicate in its terms that it was intended to over-rule the decision in *Moore v. Clarke* and that it cannot have that effect. All of the multitude of extra-hazardous employments, which are specified in Sec. 20 of Art. 101, may be per formed in any given case by regular employees or by a casual employee, who, under the provisions of Sec. 68 (3) of Art. 101, is not covered by the Act. The addition of sub-section 45A to Sec. 20, without any reference in it or elsewhere to Sec. 68 (3), leads to the conclusion that the Legislature intended by what it said to give "All persons employed by the owners or trainers of horses" the same standing and rights as all those employed in the other extra-hazardous occupations listed, and that it was to be determined in any given case, including cases of employees of owners or trainers of race horses, whether or not the employment was casual.

We reaffirm the holding in *Moore v. Clarke,* and find it is not to be distinguished on the facts and that its application to those facts was not impaired by the 1947 amendment to the compensation statutes. This being so, the order of the Circuit Court for Prince George's County was erroneous and must be reversed.

*Order reversed, with costs.*