(No. 45450.—

MAX CLARK *et al.*, Appellants, v. THE INDUSTRIAL
COMMISSION *et al.*—(James Nichols, Appellee.)

*Opinion filed June 4, 1973.*

VAN DUZER, GERSHON, JORDAN & PETERSON,
and MEHLMAN, SPITZER, ADDIS TICHO & SUSMAN,
both of Chicago (JOHN B. VAN DUZER, HORACE W.

JORDAN and JEROME D. SPITZER, of counsel), for appellants.

CAREY, FILTER & WHITE, of Chicago (EDWARD M. WHITE and EDMUND P. BOLAND, of counsel), for appellee.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

On September 7, 1963, the claimant, James D. Nichols, a professional jockey, was injured when he was thrown from the horse he was riding in the Arlington Park Futurity. After a hearing before an arbitrator for the Industrial Commission, his claim for workmen's compensation benefits against the trainer and owners of the horse was denied on the grounds that an employer-employee relationship did not exist. On review, the Industrial Commission affirmed. On *certiorari*, the circuit court of Cook County entered an order finding that the claimant was an employee and remanded the cause for further proceedings. Pursuant to the remanding order, the Industrial Commission entered a corrected decision awarding benefits, which was subsequently affirmed by the circuit court. The owners appeal from that judgment.

The evidence indicated that the claimant was an established and successful professional jockey. At the beginning of his career in 1946 he was under contract with a particular owner to ride that owner's horses in various races. However, after about three years as a "contract rider," he became a free-lance jockey traveling to different racetracks throughout the country where he was available to ride for different owners. He testified that on some days he might ride in as many as six races for six different owners and that over the course of a year he rode approximately five hundred to eight hundred mounts. His annual earnings exceeded $30,000.

As an independent jockey, the claimant hired an agent

who made contacts with different owners and trainers to obtain mounts for him. His agent received twenty-five per cent of his earnings for his services in this regard. He also hired a valet to take care of his saddles, boots, pants, safety helmet and other equipment which he provided. The only item of racing gear which he did not purchase and maintain were the silk colors of the various horse owners whose horses he rode.

The claimant, like all professional jockeys, was required to be licensed by the various States in which he rode, and he was duly licensed by the Illinois Racing Board to race in Illinois. It is undisputed that as a licensed jockey he was subject to comprehensive rules and regulations issued by the Illinois Racing Board relating to various matters including the types of whips which may be used during a race and how they may be used, required safety equipment, and a requirement that every horse must be ridden to finish as near as possible to first and show the best and fastest race it is capable of. The amount of jockey's fees and the method of their payment were also prescribed by rule. In 1963 at the Arlington Park Racetrack, the basic fee was $20 per race. If the horse won, the fee was $50, if it came in second, it was $35 and if it finished third, it was $25. By custom, a winning jockey was also paid ten per cent of the winning purse. Horse owners did not pay jockeys directly, but instead were required to deposit all jockey fees and winning bonuses with the racetrack officials. Once each week the racetrack office would distribute to the jockeys their earnings from the various owners for whom they had ridden that week without deduction or withholding for income, social security, or unemployment compensation taxes.

The owners in this case operated under the name of Grace Creek Farm and owned approximately ten horses in Kentucky and Illinois, including "Am-A-Star" which was the horse the claimant was riding at the time of his injury.

Out of his yearly average of five hundred to eight hundred mounts, claimant rode the Grace Creek Farm horses approximately twenty times and had ridden Am-A-Star four times prior to the Arlington Park Futurity. The claimant testified that in the paddock prior to the Futurity he had a discussion with the trainer of the horse and two of its owners who had contacted him directly with respect to riding Am-A-Star. Claimant testified that "they told me to save the horse all I could" and wished him luck. Max Clark, who was one of the owners, denied giving any instructions to the claimant as to how to ride the horse, adding that such instructions were unnecessary since the claimant was familiar with the horse as a consequence of his successes with the horse in prior races. The evidence as to the custom and usage of pre-race instructions by owners to jockeys and the significance of these instructions will be dealt with later in this opinion.

Claimant was thrown from Am-A-Star shortly after the start of the race, suffering injuries to his back and foot. He was taken to Northwest Community Hospital where he indicated on the hospital admission sheet that he was a self-employed jockey. His hospital and medical expenses were thereafter paid under a Lloyds of London policy provided by the Jockey Guild to which he and other jockeys contributed. He was also paid $55 per week under this policy for the period of time that he was unable to race.

Whether a person is an employee or an independent contractor depends upon an analysis of all the facts and circumstances of each particular case. As we stated in *Coontz v. Industrial Com. (1960), 19 Ill.2d 574, 577:* "No single facet of the relationship between the parties is determinative, but many factors, such as the right to control the manner in which the work is done, the method of payment, the right to discharge, the skill required in the work to be done, and the furnishing of tools, materials or equipment have evidentiary value and must be considered.

(*Henn v. Industrial Com., 3 Ill.2d 325.*) Of these factors, the right to control the work is perhaps the most important single factor in determining the relation, (*Crepps v. Industrial Com., 402 Ill. 606,*) inasmuch as an employee is at all times subject to the control and supervision of his employer, whereas an independent contractor represents the will of the owner only as to the result and not as to the means by which it was accomplished. *Immaculate Conception Church v. Industrial Com., 395 Ill. 615; Besse v. Industrial Com., 336 Ill. 283; Lawrence v. Industrial Com., 391 Ill. 80.*"

It is evident that there are many factors in this case which point toward the conclusion that the claimant was an independent contractor, such as the nature of the work he did and the special skills required, the fact that he provided his own equipment and hired a valet to maintain it, his free-lance status in which he rode on a race-by-race basis for many different owners throughout the course of the year, his hiring of an agent to obtain mounts for him, the nature of payment for each race through the track office without deduction for income, social security, and unemployment compensation taxes, and the evidence that he considered himself a "self-employed" jockey. As we have previously indicated in this opinion, there was conflicting testimony as to whether any pre-race instructions as to how to ride the horse were given to the claimant, and it is quite possible that the arbitrator, as the trier of fact, concluded that no such instructions were in fact given. The claimant argues, however, that the record shows that the owners of Am-A-Star nevertheless had the right to control the details and manner in which he rode the horse and that this factor alone established that he was an employee rather than an independent contractor.

An analysis of the testimony of the claimant and Max Clark as to the type of pre-race discussions that occur between jockeys and owners indicates that while such conversations apparently were customary, their primary

object was to familiarize a jockey with the peculiarities and characteristics of the horse he was about to ride so that he could better apply his skills in accomplishing the ultimate goal of winning the race. In response to a question as to what kind of instructions owners might give to jockeys, the claimant testified: "They know the horse and they know how he wants to run and they give you those because they, the man who owns the horse and trainer know how the horse runs best, and they tell you. A lot of times if you can't carry him in the race, the horse will get beat. Ninety per cent of the cases they know how the horse runs, they give you orders how to ride this horse, which is customary with most all owners and trainers." Insofar as the record before us discloses, the so-called pre-race "instructions" or "orders" were of a general and informative nature and were not calculated to supersede the jockey's professional skills as to the specific details of riding the horse in an attempt to bring home a winner. For example, the testimony indicated that an instruction not to use a whip or to hold the horse back early in the race to preserve his energy for a fast finish was essentially intended to impart to the jockey that the horse had a history of responding poorly to whipping or did not have the endurance to maintain a fast pace throughout the race, as the case might be. Also, it is apparent that once the race started, the owner was completely dependent on the jockey's professional skill and judgment in riding the horse as the race unfolded, and the claimant's own testimony indicated that any pre-race strategy conversations could become meaningless and ineffective in view of the particular situations which presented themselves during the course of the race. In response to another question as to what kind of instructions were given by owners to a jockey before a race, the claimant testified: "How he likes to run. They can't specify after the break. Like I said, anything can happen, the horse can stumble, upset the rider, the

race is altogether different. But you don't know those things."

Furthermore, whether the pre-race conversations between owner and jockey be called strategy talks, instructions, orders or simply information about the past history of the horse, the effect of those discussions must be considered in the context of the comprehensive rules and regulations of the Illinois Racing Board which effectively control and limit what a jockey may do during a race. For instance, Rule 234 of the 1962 rules provides: "Every horse in every race must be ridden so as to finish as near as possible to first, and show the fastest race it is capable of at the time, and shall not be eased up or coasted, even if it has no apparent chance to win first, second, third or fourth prize, so that the record of that race may, as nearly as possible show its real ability." It is apparent that any pre-race strategy talks between the owner and jockey concerning the race about to be run would have to be disregarded by the jockey to the extent they were in conflict with the racing rules and regulations.

Another factor which is significant in determining the question of whether an individual is an employee or an independent contractor is the right to discharge. Once the race begins, it is obviously impossible for the owner to discharge the jockey. It is true that after the race, if the owner is dissatisfied with the jockey's services, he could decide not to engage his services again which could be argued to be the same as the exercise of the right of discharge. However, this situation is no different than in the case of clients and patients of attorneys and physicians who under normal circumstances are considered to be independent contractors.

For the reasons above stated we are of the opinion that the evidence fully supports the conclusion of the arbitrator and the Industrial Commission that the owners of Am-A-Star did not possess that degree of control over

the details of the claimant's riding of their horse in the Arlington Park Futurity which would render him their employee during that race. (*Whalen v. Harrison (N.D. Ill. 1943), 51 F. Supp. 515.*) In so concluding, we are cognizant of the cases from other jurisdictions relied upon by the claimant which have held jockeys to be employees under the particular facts and circumstances there present. However, we believe that each of these cases is distinguishable in one respect or another. See *Pierce v. Bowen (1928), 247 N.Y. 305, 160 N.E. 379; Moore v. Clarke (1936), 171 Md. 39, 187 A. 887; East v. Skelly (1954), 207 Md. 537, 114 A.2d 822; Drillon v. Industrial Accident Com. (1941), 17 Cal. 2d 346, 110 P.2d 64; Gross v. Pellicane (1961), 65 N.J. Super. 386, 167 A.2d 838;* and *Isenberg v. California Employment Stabilization Com. (1947), 30 Cal. 2d 34, 180 P.2d 11.*

We conclude therefore that the original decision of the Industrial Commission denying compensation on the grounds that no employer-employee relationship existed was not against the manifest weight of the evidence and should not have been reversed by the circuit court of Cook County. Accordingly, the judgment of the circuit court of Cook County is reversed and the cause is remanded to the Industrial Commission with directions to reinstate its original order denying compensation.

*Reversed and remanded, with directions.*