Argued and submitted September 12, 1979, affirmed in part, reversed in part and remanded January 14, respondents Hartmans' reconsideration denied February 26, respondent Wineberg Racing Association's reconsideration denied February 26, respondent State Accident's Insurance Fund's reconsideration denied February 26, petitions for review allowed April 1, 1980

BELL,
*Petitioner,*
*v.*
HARTMAN, et al,
*Respondents.*

(No. 76-6895, CA 14475)

604 P2d 1273

Richard A. Sly, Portland, argued the cause for petitioner. With him on the brief was Bloom, Ruben, Marandas & Sly, Portland.

John S. Folawn, Portland, argued the cause for respondents Gayle Hartman, Donald G. Hartman, Don R. Hartman, Jr., Dale C. Hartman, Sr., and Ernest S. Gruenberg. With him on the brief was Jensen, DeFrancq, Holmes & Schulte, Portland.

Darrell E. Bewley, Associate Counsel, State Accident Insurance Fund, Salem, argued the cause for respondent State Accident Insurance Fund. With him on the brief was K. R. Maloney, Chief Counsel, and James A. Blevins, Chief Trial Counsel, State Accident Insurance Fund, Salem.

John Edward Snarksis, Certified Law Student, Portland, argued the cause for respondent Wineberg Racing Association, Inc., dba Portland Meadows Racetrack. With him on the brief was Bruce A. Bottini, Portland.

Before Joseph, Presiding Judge, and Lee and Richardson, Judges.

RICHARDSON, J.

JOSEPH, P. J., specially concurring in part and dissenting in part.

[22]

## RICHARDSON, J.

The issue in this workers' compensation case is whether claimant is an employee entitled to compensation for his injuries. Claimant is a "freelance" jockey, licensed to ride in horse races in Oregon and three other western states. On May 16, 1976, he sustained injuries when he fell from a horse during a race at Portland Meadows Race Track. The horse was trained by Ernest Gruenberg, and was owned by Don and Gayle Hartman. However, the horse was registered at Portland Meadows as belonging to Mr. Hartman's father. The apparent reason for the misregistration was to make the horse inaccessible to legal process by the younger Hartman's former wife.

Claimant filed and/or served claims under the Workers' Compensation Act against the Oregon Racing Commission, Portland Meadows, the served Hartmans, and Gruenberg, contending that some or all of them were his employers for purposes of the race in which he was injured and responsible for compensating him for the injury. He appeals from the Workers' Compensation Board's affirmance of the referee's conclusion that claimant was an independent contractor and is therefore not a subject worker under the Act. He also appeals from the Board's conclusion that he is not entitled to interim compensation, penalties or attorney fees from some or all of those against whom he claimed. We affirm in part, reverse in part and remand.

Freelance jockeys are itinerants who move from track to track and, generally, ride different horses owned by different persons while at a track. For example, claimant had ridden six different horses during the month and a half period he had been at Portland Meadows prior to his injury. Immediately before coming to Portland Meadows, he had ridden in approximately 20 races at a track in Yakima, Washington.

[23]

It is customary for owners or trainers of horses to give jockeys instructions or advice about how to ride their horses. The specificity of these instructions varies, and there is a dispute about how specific the instructions given to claimant were in this case. There was evidence that jockeys who fail to comply with an owner's instructions are traditionally not asked to ride again by that owner. Applicable Racing Commission rules require, in essence, that jockeys "run horses to win," and, presumably, no instructions from an owner which, in the jockey's judgment, are inconsistent with that requirement can be followed. OAR 462-30-525.

Claimant's basic contention is that the control over his services exercised by his various purported employers, especially the owners, made him a subject worker under the Workers' Compensation Act. ORS 656.005(16), (28), (30); ORS 656.027. He argues further that, if the "control" test does not make him a subject worker under the Act, the "nature of work" test articulated in *Woody v. Waibel,* 276 Or 189, 554 P2d 492 (1976), does have that effect.

The facts pertinent to the "control" test in this case are materially indistinguishable from the facts in *Clark v. Industrial Com.,* 54 Ill 2d 311, 297 NE2d 154 (1973). The Illinois Supreme Court there stated:

"Furthermore, whether the pre-race conversations between owner and jockey be called strategy talks, instructions, orders or simply information about the past history of the horse, the effect of those discussions must be considered in the context of the comprehensive rules and regulations of the Illinois Racing Board which effectively control and limit what a jockey may do during a race. For instance, Rule 234 of the 1962 rules provides: 'Every horse in every race must be ridden so as to finish as near as possible to first, and show the fastest race it is capable of at the time, and shall not be eased up or coasted, even if it has no apparent chance to win first, second, third or fourth prize, so that the record of that race may, as nearly as possible show its real ability.' It is apparent that any pre-race strategy talks between the owner

[24]

and jockey concerning the race about to be run would have to be disregarded by the jockey to the extent they were in conflict with the racing rules and regulations.

"Another factor which is significant in determining the question of whether an individual is an employee or an independent contractor is the right to discharge. Once the race begins, it is obviously impossible for the owner to discharge the jockey. It is true that after the race, if the owner is dissatisfied with the jockey's services, he could decide not to engage his services again which could be argued to be the same as the exercise of the right of discharge. However, this situation is no different than in the case of clients and patients of attorneys and physicians who under normal circumstances are considered to be independent contractors." 54 Ill 2d at 317.

Some jurisdictions (*e.g.,* Kentucky) have answered the question before us in the way Illinois has, while others (*e.g.,* California) have reached the opposite conclusion. We agree with the Illinois court's reasoning. Freelance jockeys are engaged as specialists in their field, and an owner's instructions about how to ride a horse during a one or two race engagement no more makes the jockey the owner's employee than a patient's informed consent to a surgical procedure makes the physician an employee of the patient.

Assuming *arguendo* that the "nature of work" test has any relevance where there is no "control" by a putative employer, claimant would not be aided. Claimant was not *regularly* engaged or involved in the owners' business operations. *See Woody v. Waibel,* 276 Or at 197-198. We conclude that plaintiff was not the employee of the owners. His arguments that there was an employment relationship between him and Portland Meadows, Gruenberg, and/or the Racing Commission do not warrant discussion.

We agree with claimant that the referee and Board erred by concluding he was not entitled to interim compensation. The referee's opinion and order states:

[25]

> "Claimant also asks for penalties and attorney fees for the interim period before denials by the various defendants. This claim, however, concerns the possible non-complying status of alleged employers and ORS 656.054 provides that ORS 656.262 shall not be in effect until the director has referred the claim to the State Accident Insurance Fund. Claimant's claim has never been referred to the Fund for processing but the Board requested a hearing instead. Therefore claimant is not entitled to either interim compensation or penalties and attorney fees."

In rough outline, the reason for the referee's conclusion is that one of the persons against whom claimant claimed was the elder Hartman. He, and possibly others against whom claims were made, may have been "noncomplying employers" as defined in ORS 656.005(21). The Board directed a hearing to be held on the noncomplying status issue, and the claim was never forwarded to the State Accident Insurance Fund (SAIF) by the Director of the Workers' Compensation Department.

ORS 656.054(1) provides:

> "A compensable injury to a subject worker while in the employ of a noncomplying employer is compensable to the same extent as if the employer had complied with ORS 656.001 to 656.794. A claim for compensation made by such a worker shall be processed by the State Accident Insurance Fund in the same manner as a claim made by a worker employed by a contributing employer, except that the time within which the first instalment of compensation is to be paid, pursuant to subsection (4) of ORS 656.262, shall not begin to run until the director has referred the claim to the State Accident Insurance Fund."

We are constrained to agree with the referee as to SAIF's liability *under ORS 656.054.* That statute makes it reasonably clear that the ministerial act of referring the claim to SAIF, which the Department failed to carry out, is a prerequisite to SAIF's obligations under the statute. We do not agree, however, that

this aids the other respondents, or aids SAIF in its capacity as the insurer for the Racing Commission.

ORS 656.262 provides, as relevant:

"* * * * *

"(2) The compensation due under this chapter from the fund or direct responsibility employer shall be paid periodically, promptly and directly to the person entitled thereto upon the employer's receiving notice or knowledge of a claim, except where the right to compensation is denied by the direct responsibility employer or fund.

"* * * * *

"(4) The first instalment of compensation shall be paid no later than the 14th day after the subject employer has notice or knowledge of the claim. * * *

"(5) Writen notice of acceptance or denial of the claim shall be furnished to the claimant by the fund or direct responsibility employer within 60 days after the employer has notice or knowledge of the claim. * * *

"* * * * *

"(8) If the fund or direct responsibility employer or its insurer unreasonably delays or unreasonably refuses to pay compensation, or unreasonably delays acceptance or denial of a claim, the fund or direct responsibility employer shall be liable for an additional amount up to 25 percent of the amounts then due plus any attorney fees which may be assessed under ORS 656.382.

"* * * * *."

In *Jones v. Emanuel Hospital,* 280 Or 147, 570 P2d 70 (1977), the court stated:

"Subsection (2), construed together with subsections (4) and (5), requires the employer to pay what may for convenience be called interim compensation payments until the employer denies the claim. * * *

"* * * * *

"In the context of ORS 656.262, the word 'compensation' includes what we have called interim compensation. Any other interpretation does violence to the intent of the statute. ORS 656.262 gives the employer

[27]

two choices: deny the claim or make interim payments. To interpret the word 'compensation' as the employer would have us do would give the employer a third choice: to delay acceptance or denial of the claim while making no interim payments. This third choice would delay the worker's appeal from an adverse decision since the worker cannot appeal until he or she receives the notice of denial. ORS 656.262(6). During this time, the worker would receive no benefits; thus, the employer would be able to gamble on the ultimate outcome of the case and at the same time delay that outcome. We decline to adopt such an interpretation of the statute and hold that the word 'compensation' includes interim compensation. Thus, the employer in the present case should have paid interim compensation to petitioner. Further, since there is no statutory requirement that the employee repay interim compensation if the claim is finally denied, *cf.* ORS 656.313, it follows that petitioner is now entitled to recover the interim compensation that should have been paid * * *." 280 Or at 151-152.

Some of the respondents attempt to distinguish *Jones* by pointing out that the issue there was compensability, while the issue here is whether the claimant was an employee. Nothing in the language or logic of the statutes persuades us that that distinction is meaningful. In either situation, one against whom a claim is made has the choice of denying it and allowing the process to proceed, or paying interim compensation.

It is not clear from the record when claims became known to or were received by, and when if ever denials were made by, the various respondents. On remand, the Board is directed to determine those facts and award interim compensation in accordance with its findings. *Cf.* ORS 656.307. The Board shall also determine on remand whether and what statutory penalties or attorney's fees are appropriate.

Affirmed in part, reversed in part and remanded.

**JOSEPH, P.J.,** specially concurring in part and dissenting in part.

The majority concludes that claimant was not an employee within the terms of the Worker's Compensation Law of the owners of the horse from which he fell. I concur in that conclusion *in this case,* but I would be hesitant to draw a general rule about jockeys' employment status from the present special facts. Given the peculiar circumstances of the horse racing business, I would hope that the legislature would clarify jockeys' status by a general rule.

The opinion proceeds to hold the non-employee claimant to be entitled to interim compensation (and, presumably, attorney fees and penalties!) because he made a claim which was not timely denied by the "employers" or carriers. From that I dissent. I need really go no farther than the first clause of ORS 656.054(1):

"A *compensable injury to a subject worker while in the employ of a non-complying employer* is compensable ***." (Emphasis supplied.)

The whole purpose and scheme of the Worker's Compensation Law is to provide *covered employees* protection paid for or by *responsible employers.* The law was not meant to provide protection for non-employees who get their feet in the door of the system. The majority's position could create a flood of speculative and spurious claims, because there is always a chance that a non-employee could win something from the vagaries of the administration of the system. I would not encourage that.