FOURTH DIVISION

FILED: 7/29/99

No. 1-98-1927

DANNY D. LANG and LINDA K. LANG, ) Appeal from the

) Circuit Court of

Plaintiffs-Appellants, ) Cook County.

)

v. )

)

CARLOS SILVA, CROWN'S WAY FARM, INC., )

a corporation, RONALD A. DICICILIA, ) 

and GENE CILIO, )

)

Defendants-Appellees, )

)

and )

)

REGAL FIVE, an unincorporated )

association, DEAN ANDERSON, JEFF )

STRAN, and STEVE VILLWOCK, individually )

and doing business as REGAL FIVE, ) Honorable

) Julia Nowicki,

Defendants. ) Judge Presiding.

JUSTICE HOFFMAN delivered the opinion of the court:

The instant litigation revolves around an accident which occurred on February 19, 1992, during the seventh race at Sportsman's Park racetrack.  During that race, the number one horse, ridden by jockey Danny Lang (Lang), fell, resulting in internal and external injuries to Lang.   Following the race, Carlos Silva, the jockey of the number two horse, was cited for careless riding, disqualified from the race in question, and suspended from racing for five days.  On February 18, 1994, Lang and his wife, Linda Lang, filed an amended complaint against Silva, Crown's Way Farm, Inc. (Crown's Way), Ronald Dicicilia, Gene Cilio, and other parties not relevant to this appeal.  The plaintiffs alleged that the fall resulting in Lang's injury occurred when Lang's horse came into contact with the horse ridden by Silva, owned by Crown's Way and Dicicilia, and trained by Cilio.  The complaint alleged, in relevant part, theories of negligence, willful and wanton conduct, negligent and/or willful and wanton entrustment, and loss of consortium.

On September 6, 1994, Silva filed a motion to dismiss counts I through IV of the plaintiffs' amended complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 1996)).  The trial court granted the motion in part, dismissing count I (negligence) and count III (willful and wanton conduct), but allowing the plaintiffs leave to replead those counts.  On August 7, 1995, the plaintiffs filed their "Second Amended Counts I-IV" (hereinafter referred to as the second amended complaint).  Each of the four counts in the second amended complaint were directed against Silva, Crown's Way, Dicicilia, and Cilio.  Count I alleged that Silva's negligence had resulted in the collision during the seventh race and that Crown's Way, Dicicilia, and Cilio were vicariously liable for Silva's negligence.  Count III alleged that Silva's willful and wanton conduct caused the collision.  Count III also sought recovery against Crown's Way, Dicicilia, and Cilio on theories of vicarious liability and negligent and/or willful and wanton entrustment.  Counts II and IV mirrored the theories of liability in counts I and III and asserted claims for loss of consortium on behalf of Linda Lang.

Silva filed a section 2-615 motion to dismiss the plaintiffs' second amended complaint.  Crown's Way, Dicicilia, and Cilio also filed a joint section 2-615 motion.  The two motions contained essentially the same arguments in support of dismissal, namely that: 1) count I should be dismissed because Lang had voluntarily assumed the risk of injury and because, as a voluntary participant in a contact sport, he was unable to recover damages caused by Silva's negligence; 2) count III should be dismissed because, stripped of its conclusory language, it was insufficient to allege a cause of action for willful and wanton misconduct; and 3) counts II and IV, asserting causes of action for loss of consortium, should be dismissed because they were contingent on  findings of liability under counts I and III.

On August 28, 1996, the trial court denied both section 2-615 motions to dismiss, apparently suggesting that a motion to dismiss pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 1996)) would be more appropriate as it would allow the parties to submit factual material about the sport of horse racing in order to enable the court to make a determination as to whether it was a contact sport.  Thereafter, Silva, Crown's Way, Dicicilia, and Cilio filed a joint section 2-619 motion to dismiss counts I and II of the second amended complaint, repeating the arguments directed toward those counts in their respective section 2-615 motions.

In support of their motion to dismiss, the defendants submitted a number of affidavits and depositions, a report regarding the number of horse racing related injuries reported in 1995, newspaper articles regarding the dangers of horse racing, and videotapes of the race in which Lang was injured as well as of several days worth of races.  Among the affidavits were those of John Giovanni and Heriberto Arroyo, who had been jockeys for periods of 20 and 12 years respectively and ridden in 18,000 and 10,000 races respectively.  Giovanni and Arroyo each averred that they had viewed tens of thousands of races.  Giovanni estimated that contact between horses occurred in about 95% of the races in which he rode and further stated that he saw contact between horses, including the touching, bumping, and brushing of various parts of the horses' bodies and "clipping of the heels and the like", in nearly every race he viewed.  Arroyo averred that he had viewed contact between horses in nearly every race.

The defendants also submitted Silva's deposition, in which he testified that, since beginning his career in the United States in 1978, he had participated in approximately 10,000 races.  Asked about the frequency of contact that actually occurs during a race, Silva answered: "Oh, I don't want to say every race; but they have contacts a lot."  Silva averred that horses clip heels "all the time" and that "[t]here is a lot of contact in the race."  The defendants also submitted the depositions of Juvenal Diaz, Curt Bourque, Eddie Baird, Cilio, and Eric Viox.  At the time of their depositions, Diaz, Bourque, and Baird had been jockeys for periods of 26, 13, and 12 years, respectively.  Diaz and Baird testified that contact occurs during almost every race, and Bourque testified that it is a common occurrence.  Cilio, who had been a trainer since 1987, testified that contact between horses occurs in almost every race.  Eric Viox testified that he rode as a jockey in 1975-76 and had been a racing steward in Illinois from 1985 to 1993.  Viox testified that there is "some bumping or contact" in "just about every race."

The plaintiffs filed a response to the defendants' motion to dismiss, to which they attached Lang's affidavit.  Lang averred that, between 1970 and 1992, he had ridden in approximately 10,000 races, quarterhorse or thoroughbred.  According to Lang, "physical contact between horses and riders during a race rarely occurs unless the rider fails to control the horse."  He estimated that, during his 22 years of racing, he experienced contact during a race no more than 10 to 20 times per year and that "[c]ontact between riders was not inherent or inevitable, but was rare."

On November 5, 1997, the trial court held a hearing on the defendants' section 2-619 motion.  It granted the motion and dismissed counts I and II of the second amended complaint as to all defendants, finding that horse racing is a contact sport falling within the contact sport exception to liability for negligence as defined by our courts.  On December 12, 1997, the plaintiffs filed a motion requesting that the trial court enter an order finding that no just reason existed to delay enforcement or appeal of its November 5 order.

On January 23, 1998, Crown's Way, Dicicilia, and Cilio filed a motion for summary judgment as to counts III and IV of the second amended complaint.  They argued that they were entitled to entry of summary judgment in their favor for two reasons: 1) they could not be held vicariously liable for Silva's conduct because he was an independent contractor; and 2) the plaintiffs claims of negligent or willful and wanton entrustment of the horse to Silva were not supported by Silva's racing record.  In support of their motion for summary judgment, these defendants submitted the depositions of Lang, Silva, Dicicilia, Cilio, Diaz, Baird, Bourque, and Viox; the videotapes of several days worth of racing; and a transcript of Silva's racing history.

In his deposition, Silva testified that he was self-employed.  The races he rode in were arranged through his agent.  At the time of the race in question, about 30% of the races he rode were for Crown's Way.   Crown's Way provided the horse and the silks, but Silva was required to provide his own saddle.   Silva testified he was paid 10% of the horse's purse for a first place finish, 5% for a second or third place finish, and $50 per race for anything else.   The racetrack bookkeeper would deduct the money due him from the horse's guarantee and pay him. Silva testified that, in general, he would meet with a horse's trainer in the paddock prior to the race.  The trainer tells him "how they think the horse is going to run better."  Silva further testified, though, that when the gates open, the jockey has to "hold [his] own" and that, despite the trainer's suggestions, he exercises his own best judgment as to how to run the race.   The only thing he recalled Cilio saying to him prior to the race in question is "You ride the race and try to do the best."  Silva testified that he had been cited for riding violations 11 times in the preceding 15 years.  Each of the violations was for careless riding.  He also testified that a typical jockey would have more than a few racing violations per year.

In his deposition, Dicicilia testified that one of the reasons he chose Silva to ride his horses was that "throughout the industry Carlos Silva has the reputation of being a careful and serious minded rider who doesn't take chances."  Dicicilia further testified that Silva was paid out of the race track account, not Crown's Way's account, and that Crown's Way did not provide any insurance coverage for the jockeys it used.

Cilio testified that prior to a race the jockey and trainer evaluate the field to try to decide how to run the race.  As the trainer, he has the authority to tell the jockey how he wants him to run the race.  His standard instructions are "if they're not familiar to tell them some of the peculiarities of the horse".  Once the jockey leaves the gate, though, he has control and may do as the race dictates.  On the date in question, Cilio told Silva that "when she breaks just do the best you can."  Cilio testified that he was not aware of the exact number of violations Silva had, but he knew it was "very few."  He testified that, considering the number of races in which Silva had ridden, Silva had "far less" violations than most jockeys and that his record was much better than the average jockey's record.  

Viox testified that  Silva was a very careful rider and that 12 violations during a 10 to 15 year period including 10,000 to 15,000 races is a better than average record.  Baird testified that, in February 1992, Silva had the reputation of being an excellent jockey.

On April 23, 1998, the trial court conducted a hearing on the motion for summary judgment.  The trial court granted the motion for summary judgment, finding that: 1) Crown's Way, Dicicilia, and Cilio could not be held vicariously liable for Silva's allegedly willful and wanton conduct because Silva was an independent contractor as a matter of law; and 2) the evidence presented regarding Silva's racing history was  not sufficient to support the cause of action for negligent and/or willful and wanton entrustment.  In its order, the trial court made a finding, pursuant to Supreme Court Rule 304(a), that no just reason existed to delay enforcement or appeal of its ruling on the motion for summary judgment or its November 5, 1997, order dismissing counts I and II of the plaintiffs' second amended complaint.  This appeal followed.

The plaintiffs first argue that the trial court erred in dismissing counts I and II of their second amended complaint.  They contend that horse racing is not a contact sport and that the defendants should not, therefore, be allowed to escape liability for negligence based upon the contact sports exception.  The Jockeys' Guild, Inc., has submitted a brief as 
amicus
 
curiae
 in which it urges us to find that thoroughbred racing is, indeed, a contact sport.

Illinois courts have created an exception to the standard of ordinary care, whereby voluntary participants in contact sports are not liable to co-participants for injuries caused by negligent conduct but are liable only for injuries caused by willful and wanton or intentional misconduct.  
Pfister v. Shusta
, 167 Ill. 2d 417, 420, 657 N.E.2d 1013 (1995).  
In determining what constitutes a contact sport, our courts have focused on whether physical contact is inevitable and inherent in the activity.  See 
Pfister
, 167 Ill. 2d at 425 (participants in sports where physical contact is "inherent and virtually inevitable" assume greater risk of injury than participants in noncontact sports); 
Landrum v. Gonzalez
, 257 Ill. App. 3d 942, 948, 629 N.E.2d 710 (1994)(softball a contact sport where "physical contact is part of the game").  This court noted in 
Zurla v. Hydel
, 289 Ill. App. 3d 215, 221, 681 N.E.2d 148  (1997), that, in each case where Illinois courts have applied the contact sports exception, physical contact with co-participants or with "some physical component of the game" has been "part and parcel of the sport" involved.

In support of their contention that physical contact between the horses and riders is not an inherent or inevitable part of a professional horse race, the plaintiffs point to the Rules of the Race promulgated by the Illinois Racing Board in accordance with authority granted them by the Illinois Horse Racing Act (230 ILCS 5/9(b) (West 1996)).  The Rules of the Race provide that a jockey may be disciplined for: crossing and weaving in front of any horse in such a manner as to constitute interference or intimidation; crossing in front of another horse in such a manner as to actually impede that horse; jostling another horse; willfully striking another horse; or riding willfully or carelessly so as to injure another horse.  11 Ill. Adm. Code §1416.5 (1996).  The rules further make reference to three different types of sanctionable conduct: careless riding, rough riding, and foul riding.  11 Adm. Code §1411.160, §1416.10 (1996).

The plaintiffs' argue that, because contact is prohibited by the Rules of the Race, thoroughbred horse racing is not a contact sport.  This argument is flawed.  First, while the plaintiffs correctly state that the defendants cannot point to any rule that says contact is allowed in the sport, neither have the plaintiffs pointed to any rule which states that all contact is prohibited or subject to sanction.  Rather, the rules provide that certain types of conduct, such as crossing over in front of another horse or weaving, conduct which may or may not involve contact between horses, is prohibited.   In 
Pfister v. Shusta
, our supreme court discussed and rejected a five-part factual analysis which this court had applied in that case in lieu of the contact sports exception and which focused in part on whether the injury-causing conduct was prohibited by the rules of the game rather than on whether that conduct was negligent or willful and wanton.  
 
Pfister
, 167 Ill. 2d at 422-24.  The 
Pfister
 court noted that, even in sports where there are rules governing the permissible degree of physical contact, rule infractions are inevitable and justify a lower standard of care than ordinary negligence.  
Pfister
, 167 Ill. 2d at 424.  We see no reason to deviate from this holding simply because the rules of this particular sport are contained in the Illinois Administrative Code and have, as the plaintiffs contend, the force of law.

In support of their contention that horse racing is a contact sport, the defendants rely on the affidavits and depositions submitted in support of their motion and upon cases from other jurisdictions where courts have barred negligence actions between fellow competitors in the sport of horse racing.  See 
Santiago v. Clark
, 444 F. Supp. 1077 (N.D. W. Va. 1978); 
Ordway v. Superior Court
, 198 Cal. App. 3d 98, 243 Cal. Rptr. 536 (1988); and 
Turcotte v. Fell
, 68 N.Y.2d 432, 502 N.E.2d 964 (1986).  The defendants admit that these cases were decided on the theory of implied assumption of risk but argue that they, nonetheless, support a finding that horse racing is a contact sport.

We do not quarrel with the plaintiffs' assertion that "the underlying philosophy of this sport is to avoid contact between the animals and riders."  Our review of the affidavits and depositions of those involved in the horse racing profession reveals that contact is, indeed, to be avoided and that it can sometimes result in sanctions and/or injuries.  In 
Zurla
, we stated that the fact that there existed "an inherent risk that players may accidentally touch one another" was not relevant to the inquiry of whether a contact sport existed.  
Zurla
, 289 Ill. App. 3d at 221.  Conversely, we find it irrelevant that it is possible, or even preferable, that a horse race can be run without any contact occurring between the horses and their riders.  Rather, our focus is on whether, in reality, physical contact occurs on a regular basis, i.e. whether it is "part and parcel" of the sport.  
Zurla
, 289 Ill. App. 3d at 221.

 When the defendants initially moved for dismissal under section 2-615 on the basis that horse racing was a contact sport, the trial court denied the motion, suggesting to the parties that, in order to determine whether horse racing was a contact sport, it would need the assistance of evidentiary material not allowed by a section 2-615 motion.  We must now consider whether dismissal under section 2-619 was appropriate in light of the evidentiary material submitted.

A section 2-619 motion to dismiss provides a means for disposing of issues of law or easily proved issues of fact at the outset of the case.  
Zedella v. Gibson
, 165 Ill. 2d 181, 185, 650 N.E.2d 1000 (1995).  When ruling on a section 2-619 motion, the court may consider pleadings, depositions, and affidavits.  
Zedella
, 165 Ill. 2d at 185.   If evidentiary facts asserted in affidavits filed in support of the motion to dismiss are not refuted by a counteraffidavit, those facts will be deemed admitted.  
Kedzie & 103rd Currency Exchange, Inc. v. Hodge
, 156 Ill. 2d 112, 116, 619 N.E.2d 732 (1993).  
When considering an appeal from a dismissal pursuant to section 2-619, we must determine whether a genuine issue of material fact exists which should have precluded dismissal and, if no such issue exists, whether dismissal was proper as a matter of law.  
Kedzie & 103rd Currency Exchange
, 156 Ill. 2d at 116-17.  Our review is 
de
 
novo
.  
Spiegel v. Hollywood Towers Condominium Ass'n
, 283 Ill. App. 3d 992, 998, 671 N.E.2d 350 (1996).

The existence of a duty is a question of law (
Ward v. K Mart Corp.
, 136 Ill. 2d 132, 140, 554 N.E.2d 223 (1990)), and the lack of a duty is an appropriate basis for a section 2-619 motion (
Milz v. M.J. Meadows, Inc.
, 234 Ill. App. 3d 281, 287, 599 N.E.2d 1290
 (1992)).  Under the contact sports exception, a participant in a contact sport does not owe a duty of ordinary care to his fellow participants.  The question of whether a particular sport is a contact sport, though, is a question of fact.  Therefore, the question of whether Silva owed Lang a duty of ordinary care in this case is a mixed question of law and fact.  See 
Whittaker v. Honegger
, 284 Ill. App. 3d 739, 745, 674 N.E.2d 1274  (1996).  Where mixed questions of law and fact are involved, "a proper allocation of function between the trier of law and the trier of fact" is necessary.  
Kujbida v. Horizon Insurance Agency, Inc.
, 260 Ill. App. 3d 1001, 1004, 632 N.E.2d 151 (1994).  When presented with a mixed question of law and fact on review, the appellate court must review the questions of fact under a manifest weight standard and the questions of law under a 
de
 
novo
 standard.  
Indiana Insurance Co. v. Liaskos
, 297 Ill. App. 3d 569, 574, 697 N.E.2d 398 (1998); 
Board of Education v. State Board of Education
, 292 Ill. App. 3d 101, 110, 685 N.E.2d 412 (1997); but see 
Virden v. Board of Trustees
, 304 Ill. App. 3d 330, 709 N.E.2d 986 (1999) (clearly erroneous standard of review); 
Zeitz v. Village of Glenview
, 304 Ill. App. 3d 586, 710 N.E.2d 849 (1999)(clearly erroneous standard of review).

We acknowledge that this court has previously affirmed the trial court's dismissal of complaints or entry of summary judgment in favor of the defendants in cases involving the contact sports exception.  See 
Pfister
, 167 Ill. 2d 417; 
Novak v. Virene
, 224 Ill. App. 3d 317, 586 N.E.2d 578 (1991); 
Ramos v. City of Countryside
, 137 Ill. App. 3d 1028, 485 N.E.2d 418 (1985); 
Oswald v. Township High School District No. 214
, 84 Ill. App. 3d 723, 406 N.E.2d 157 (1980).  From our review of these cases, though, it does not appear that the evidentiary materials submitted in support of and in opposition to the motions involved therein created a factual dispute as to the frequency of contact occurring during the sports involved.  The defendants in this case submitted affidavits and depositions from a number of current and former jockeys, all of whom averred that some form of physical contact occurs in nearly every horse race.  Lang, however, submitted his own affidavit, in which he averred that physical contact in horse racing is "rare."  Lang's affidavit might well be deemed conclusory in this regard.  However, since the defendants failed to attack the sufficiency of the plaintiff's affidavit before the trial court, all issues with respect thereto are waived for purposes of this appeal.  
Kolakowski v. Voris
, 83 Ill. 2d 388, 398, 415 N.E.2d 397 (1980).  Lang's affidavit, when viewed in the light most favorable to the plaintiffs, is sufficient to create a disputed issue of fact on the question of the frequency of contact in professional horse racing.  As the plaintiffs have filed a jury demand in this case, it was inappropriate for the trial court to decide this disputed factual issue.
  735 ILCS 5/2-619(c) (West 1996); 
Hertel v. Sullivan
, 261 Ill. App. 3d 156, 160, 633 N.E.2d 36 (1994).

While we recognize that the great weight of the evidence submitted to the trial court supports a finding that horse racing is a contact sport, we cannot ignore the fact that such a finding involves a credibility determination which the trial court was not allowed to make in the context of this section 2-619 motion.  Therefore, we have no choice but to reverse the trial court's dismissal of counts I and II and remand for further proceedings.

We now turn to the plaintiffs' contention that the trial court erred in entering summary judgment in favor of Crown's Way, Dicicilia, and Cilio as to counts III and IV of the plaintiffs' second amended complaint.  Count III alleged that Crown's Way, Dicicilia, and Cilio were vicariously liable for Silva's allegedly willful and wanton conduct and that they negligently or willfully and wantonly entrusted a horse to Silva.

Summary judgment should be granted only if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1996).  In determining whether summary judgment is appropriate, the court must construe the pleadings, depositions, admissions, and affidavits strictly against the party seeking summary judgment and liberally in favor of the party opposing it.  
In re Estate of Whittington
, 107 Ill. 2d 169, 177, 483 N.E.2d 210 (1985).  We review entry of a summary judgment 
de
 
novo
.  
Majca v. Beekil
, 183 Ill. 2d 407, 416, 701 N.E.2d 1084 (1998).

We will first consider whether the trial court erred in determining that Crown's Way, Dicicilia, and Cilio could not be vicariously liable for Silva's allegedly willful and wanton conduct because Silva was an independent contractor.  The plaintiffs assert that Silva was an employee or agent of Crown's Way and that, at the least, Silva's status is a question of fact which cannot be decided by way of summary judgment.

"Although the terms 'principal' and 'agent' and 'employer' and 'employee' may have separate connotations for purposes of contract authority, such distinctions are immaterial for tort purposes."  
Moy v. County of Cook
, 159 Ill. 2d 519, 532, 640 N.E.2d 926 (1994).  The doctrine of 
respondeat
 
superior
 can be invoked where either relationship exists, allowing for a principal or employer to be held liable for acts committed by an agent or employee acting within the scope of his agency or employment.  
Moy
, 159 Ill. 2d at 532;   
Lewis v. Mount Greenwood Bank
, 91 Ill. App. 3d 481, 487, 414 N.E.2d 1079 (1980); 
Marco v. County of McHenry
, 218 Ill. App. 3d 503, 505, 578 N.E.2d 579 (1991).  One who hires an independent contractor, though, is generally not liable for the negligent or intentional acts or omissions of the contractor.  
Gomien  v. Wear-Ever Aluminum, Inc.
, 50 Ill. 2d 19, 21, 276 N.E.2d 336 (1971); 
Kouba v. East Joliet Bank
, 135 Ill. App. 3d 264, 481 N.E.2d 325 (1985).  

An independent contractor  undertakes to produce a certain result but is not controlled as to the method in which he obtains that result.  
Spivey v. Brown
, 150 Ill. App. 3d 139, 143, 502 N.E.2d 23 (1986).  A principal-agent relationship is said to exist where the principal has the right to control the manner and method in which the agent performs his work and the agent has the ability to subject the principal to personal liability.  
Knapp v. Hill
, 276 Ill. App. 3d 376, 380, 657 N.E.2d 1068 (1995).  There is no rigid rule for determining whether a person is an agent or employee or an independent contractor.  
Davis v. Industrial Comm'n
, 261 Ill. App. 3d 849, 852, 634 N.E. 2d 1117 (1994).  Among the factors to be considered when making the determination are: the right to control the manner in which the work is performed; the right to discharge; the method of payment; whether taxes are deducted from the payment; the level of skill required to perform the work; and the furnishing of the necessary tools, materials, or equipment.  
Davis
, 261 Ill. App. 3d at 852; 
Shoemaker v. Elmhurst-Chicago Stone Co. Inc.
, 273 Ill. App. 3d 916, 920, 652 N.E.2d 1037 (1995).  No single factor is determinative but the right to control the manner in which the work is performed is considered to be the predominant factor.  
McConnell v. Freeman United Coal Co.
, 198 Ill. App. 3d 322, 325-26, 555 N.E.2d 993 (1990); 
Walker v. Midwest Emery Freight Systems
, 119 Ill. App. 3d 640, 645-46, 461 N.E.2d 1373 (1983).

The question of whether one is an agent or employee or an independent contractor is generally a question of fact.  
Shoemaker
, 273 Ill. App. 3d at 920; 
DeRosa v. Albert F. Amling Co.
, 84 Ill. App. 3d 64, 66-67, 404 N.E.2d 564 (1980).  The question may be decided as a matter of law, though, when the relationship is so clear as to be indisputable.  
Shoemaker
, 273 Ill. App. 3d at 920-

21.  
Manahan v. Daily News-Tribune
, 50 Ill. App. 3d 9, 16, 365 N.E.2d 1045 (1977).

In  
Clark v. Industrial Comm'n
, 54 Ill. 2d 311, 297 N.E.2d 154 (1973)
, 
 a jockey filed a claim for workmen's compensation benefits against the owner and trainer of a horse he was riding when injured.  The Industrial Commission affirmed the trial court's denial of the claim on the grounds that the jockey was an independent contractor.  The 
Clark
 court stated:

"It is evident that there are many factors in this case which point toward the conclusion that the claimant was an independent contractor, such as the nature of the work he did and the special skills required, the fact that he provided his own equipment and hired a valet to maintain it, his free-lance status in which he rode on a race-by-race basis for many different owners throughout the course of the year, his hiring of an agent to obtain mounts for him, the nature of payment for each race through the track office without deduction for income, social security, and unemployment compensation taxes, and the evidence that he considered himself a 'self-employed' jockey."  
Clark
, 54 Ill. 2d at 315.

As to the element of control, the 
Clark
 court stated that: "Insofar as the record before us discloses, the so-called pre-race 'instructions' or 'orders' were of a general and informative nature and were not calculated to supersede the jockey's professional skills as to the specific details of riding the horse in an attempt to bring home a winner."  
Clark
, 54 Ill. 2d at 316.

The plaintiffs correctly note that the 
Clark
 court merely concluded that the Industrial Commission's determination that the jockey was an independent contractor was not against the manifest weight of the evidence and did not rule that, as a matter of law, all jockeys are independent contractors.   Nonetheless, we believe the 
Clark
 decision supports a finding that Silva was, in fact, an independent contractor of Crown's Way as a matter of law rather than an employee or agent.  The evidence in the record established that Silva had retained an agent to obtain and schedule races for him, that he rode on a per race basis for various owners, that Crown's Way did not pay Silva directly but rather the racetrack withdrew money from the horse's guarantee and paid Silva, that Crown's Way did not provide any type of insurance for Silva, and that Silva provided his own saddle. Furthermore, there was evidence that jockeys are required to be licensed in Illinois, and it is apparent to us that riding a thoroughbred horse in a professional horse race requires specialized skill.  As to the element of control, the key element in the tests for employer-employee and principal-agent relationships, we find the evidence here establishes, as it did in 
Clark
, that the pre-race discussions between Silva and Cilio were designed to familiarize Silva with the peculiarities and characteristics of the horse he was going to ride and were not intended to override Silva's professional judgment.  Based on the record before us, we have no difficulty in finding that Silva was an independent contractor as a matter of law.

Exceptions to the general rule of non-liability for the acts or omissions of an independent contractor do exist where the employing party fails to use reasonable care in selecting the contractor or directs the contractor to commit the act in question.  
Jones v. Beker
, 260 Ill. App. 3d 481, 485, 632 N.E.2d 273 (1994).  Neither of these exceptions applies in the instant case.  The plaintiffs did not allege that Dicicilia or Cilio instructed Silva to interfere with Lang's horse, nor did they present any evidentiary material supporting such a proposition.  The plaintiffs correctly note that the employer of an independent contractor can be held liable where the work he hires the contractor to perform is an inherently dangerous activity.  See 
Jones
, 260 Ill. App. 3d at 487.  The plaintiffs baldly assert that "[t]he facts concerning the Silva/Owners relationship adduced through deposition testimony would fully support a jury finding" that this exception to the general rule of nonliability applies.  We decline to address this argument as the plaintiffs supply no further reasoning for or discussion of this contention as required by Supreme Court Rule 341(e)(7).  177 Ill. 2d R. 341(e)(7).  We find that the trial court properly granted summary judgment in favor of Crown's Way, Dicicilia, and Cilio as to the portion of count III alleging vicarious liability for Silva's allegedly willful and wanton conduct and that portion of count IV (loss of consortium) predicated upon that theory.  We note that our finding that Silva was an independent contractor as a matter of law has now become the law of the case.  
Wade v. City of Chicago Heights
, 295 Ill. App. 3d 873, 880-81, 693 N.E.2d 426 (1998).  Consequently, Crown's Way, Dicicilia, and Cilio cannot be held vicariously liable for Silva's negligence, if any, and, therefore, the plaintiffs cannot succeed against those defendants on counts I (negligence) and II (loss of consortium predicated on negligence) of their amended complaint.  Therefore, we instruct the trial court on remand to dismiss counts I and II of the second amended complaint as to Crown's Way, Dicicilia, and Cilio.

We now turn to the remaining allegations contained in count III, the plaintiffs' claim that Crown's Way, Dicicilia, and Cilio are liable for damages caused by Silva's allegedly willful and wanton conduct under a theory of negligent and/or willful and wanton entrustment.  In their second amended complaint, the plaintiffs alleged that, prior to February 1992, Silva had committed 12 racing violations.  The plaintiffs further alleged that Crown's Way, Dicicilia, and Cilio had actual or constructive knowledge of these racing violations and that they "deliberately or with a conscious indifference and reckless disregard for the safety of the plaintiff, wilfully and wantonly" allowed Silva to ride their horse in "a knowingly foul and reckless manner in violation of the rules" and failed to instruct Silva to refrain from riding the horse "in a foul and reckless manner which violated the rules."  While the parties have apparently treated this count as asserting liability only on the theory of negligent entrustment, the language of the count clearly alleges willful and wanton entrustment.  We will address both theories.

In order to prevail in a negligent entrustment theory, the plaintiff must show that the defendants entrusted a dangerous article to another whom they knew or should have known was likely to use the article in a manner causing an unreasonable risk of harm to others.  
Barth v. Massa
, 201 Ill. App. 3d 19, 27, 558 N.E.2d 528 (1990).  There is also a cause of action for willful and wanton entrustment, but this cause of action requires proof that the defendant's act of entrusting the article to another is " ' a course of action which shows actual or deliberate intention to harm, or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others.'  Illinois Pattern Jury Instructions, Civil, No. 14.01 (2d ed. Supp. 1981)."  
Richards v. Checker Taxi Co., Inc.
, 168 Ill. App. 3d 154, 156, 522 N.E.2d 650 (1988).  The questions of whether a defendant is guilty of negligence or willful and wanton conduct are generally ones of fact but may be decided as a matter of law where reasonable minds could not differ.  
Hampton v. Cashmore
, 265 Ill. App. 3d 23, 30-31, 637 N.E.2d 776 (1994); 
Giers v. Anten
, 68 Ill. App. 3d 535, 539, 386 N.E.2d 82 (1978).

The plaintiffs presented evidence that between 1978 and February 1992 Silva had 12 racing violations which had resulted in disqualification and suspensions varying from five to seven days.  They also submitted records establishing that, as of the date of the race, Silva had more racing violations than any other jockey involved in the race.  The defendants, however, submitted records establishing the number of races run by each of the eight jockeys in question.  Under a violations per race basis, five of the other eight jockeys had a higher ratio of violations than Silva.  Dicicilia testified at his deposition that one of the reasons he chose Silva to ride his horses was that Silva had a reputation of being a careful rider who did not take chances.  Cilio testified that Silva had far less violations than most jockeys and a much better record.  Viox, who had previously worked as a jockey and as a racing steward in Illinois, testified that Silva was a very careful rider and that 12 violations occurring over a 10 to 15 year period during which a jockey had ridden in 10,000 to 15,000 races was a better than average record.  Furthermore, jockey Baird testified that, in February 1992, Silva had the reputation of being an excellent jockey.  The plaintiff presented no testimony, either his own or that of another jockey or person otherwise associated with the horse racing industry, to establish that Silva's record should have raised a question as to his suitability as a jockey.

Based on the undisputed facts, we do not believe that reasonable minds could differ as to whether, when Crown's Way, Dicicilia, and Cilio entrusted the horse to Silva, they knew or should have known that Silva was likely to ride the horse "in a manner causing an unreasonable risk of harm to others."  Therefore, we affirm the trial court's entry of summary judgment in favor of Crown's Way, Dicicilia, and Cilio as to the portion of count III alleging negligent and/or willful and wanton entrustment and as to the portion of count IV (loss of consortium) predicated upon those theories.

For the foregoing reasons, we: reverse the trial court's implicit finding of the absence of a disputed factual issue on the question of whether professional horse racing is a contact sport and its dismissal of counts I and II of the second amended complaint against all defendants based thereon; affirm the trial court's entry of summary judgment as to counts III and IV in favor of Crown's Way, Dicicilia, and Cilio; and remand to the trial court with directions that it dismiss counts I and II as to Crown's Way, Dicicilia, and Cilio and for further proceedings.

Affirmed in part, reversed in part, and cause remanded with directions.

SOUTH, P.J., and HALL, J., concur.