THIRD DIVISION

                                       Date Filed: 

No. 1-01-3675

WAYNE PROWELL and JOHN PROWELL,    ) Appeal from the

Co-Special Adm'rs of the Estate of ) Circuit Court of

Essie Prowell, Deceased,           ) Cook County.            

                                   )

      Plaintiffs-Appellants,       )

                                   )

      v.                           ) No. 98 L 7145

                                   )

LORETTO HOSPITAL, an Illinois Not- )

For-Profit Corporation,            )

                                   )

      Defendant,                   )

                                   )

(The City of Chicago, a Municipal  ) Honorable

Corporation,                       ) Paddy H. McNamara,

                                   ) Judge Presiding.

      Defendant-Appellee).         )      

     JUSTICE HALL delivered the opinion of the court:     

                                                            

     The plaintiffs, Wayne Prowell and John Prowell, appeal from an order of the circuit court of Cook County, granting summary judgment to the defendant, the City of Chicago (the City).

     On June 10, 1999, the plaintiffs filed their first amended complaint against Loretto Hospital and the City.
(footnote: 1)   In the complaint, the plaintiffs alleged that on June 24, 1997, Essie Prowell, the plaintiffs' mother, was transported to Loretto Hospital by ambulance.  Upon arrival at the hospital, as Mrs. Prowell was removed from the ambulance on a stretcher, she fell off the stretcher onto the concrete ramp leading into the hospital and sustained injuries that resulted in her death on July 23, 1997.    

     The first amended complaint further alleged that the two emergency technicians (EMTs) who transported Mrs. Prowell from the ambulance into the hospital emergency room were negligent in that they:

"a.  Failed to strap or otherwise secure ESSIE PROWELL's body to the full stretcher prior to transporting her to the ambulance to the hospital.

 b.  Failed to properly hold or grip the full stretcher while transporting ESSIE PROWELL's body from the ambulance to the Loretto emergency department.

 c.  Failed to communicate with the other emergency medical technician as to the movement of ESSIE PROWELL's body from the ambulance to the hospital.

 d.  Dropped and/or failed to hold ESSIE PROWELL's body while transporting her from the ambulance into the Loretto emergency department.  

 e.  Moved ESSIE PROWELL's body from the ambulance into the Loretto emergency department in a manner inconsistent with training an emergency medical technician receives."
(footnote: 2)  

     On April 11, 2001, the City filed its motion for summary judgment.  The City contended that there was no evidence that the EMTs acted willfully or wantonly or that they had moved Mrs. Prowell in any way inconsistent with their training.  In support of its motion, the City relied on the following deposition testimony.

     Wayne Prowell testified that on June 24, 1997, he called 911 because his mother was feeling weak.  After the ambulance arrived, the EMTs determined that Mrs. Prowell should be transported to the hospital.  Wayne was present when Mrs. Prowell was placed on the stretcher; he did not notice any problems when his mother was moved from the house to the ambulance.  Wayne rode to the hospital in the ambulance and stood by the rear door of the ambulance while Mrs. Prowell was being removed.  

     Wayne acknowledged that he had problems remembering what happened.  He knew that Mrs. Prowell ended up on the ground, but he did not know how it happened.  He did remember hearing one of the EMTs say to the other "See I told you," but he did not understand what that meant.  Wayne did not recall whether the stretcher was in a position close to the ground or in a higher position or whether the stretcher moved at all after Mrs. Prowell was removed from the ambulance.  He did not remember seeing any potholes in the area.  Wayne could not remember whether Mrs. Prowell was strapped to the stretcher.  He could not remember whether the stretcher collapsed or fell over.  He has difficulty with his eyes and has problems visualizing up, sideways and directly down.  

     Andrea McEastland testified that he was a friend of Wayne Prowell's and was acquainted with Mrs. Prowell through the church they both attended.  He was present at the time Mrs. Prowell was placed in the ambulance for the trip to the hospital.  The EMTs strapped Mrs. Prowell on to the stretcher with straps around each of her legs and her waist.  The stretcher was lowered and then placed in the ambulance.    

     Mr. McEastland then walked to the hospital and arrived just as Mrs. Prowell was being removed from the ambulance.   One EMT was in the front of the stretcher, where Mrs. Prowell's head was, and the other was at the back of the stretcher.  After the stretcher was removed from the ambulance, the EMTs pulled the wheels of the stretcher out and set it on the ground in the high position.  Mrs. Prowell was still strapped to the stretcher, but Mr. McEastland did not know how secure she was because her arms were moving.  After closing the ambulance doors, the EMTs, one in front and one in back of the stretcher, began to push it toward the hospital.  As the stretcher was being pushed, the front legs of the stretcher "went in," and Mrs. Prowell slid out, striking her head on the pavement.  One of the paramedics tried to catch her and in doing so may have then tipped over the stretcher.  The stretcher had moved only a few feet from the ambulance when the accident occurred.  Mr. McEastland recalled that one of the EMTs said to the other, "'I told you you didn't have the legs locked,' or something like that, about the legs didn't lock under the gurney
(footnote: 3)."  The other EMT responded, "'I thought I had it right.'"  Wayne and Mr. McEastland tried to get Mrs. Prowell back on the stretcher.  After the stretcher had been righted and was back up, one of the EMTs "slapped" the legs very tight.  After Mrs. Prowell was placed back on the stretcher, she was strapped in very tightly. 

     According to Mr. McEastland, there was nothing on the pavement to cause the legs of the gurney to collapse.   However, his attention was focused on Mrs. Prowell, and he did not see the stretcher wheels come into contact one way or another with a pothole.  He did not know the specific reason the stretcher collapsed.  His view of the stretcher wheels rolling against the pavement was obstructed at the time the stretcher collapsed. 

     Neither John R. Florine nor John P. Leen, the EMTS who transported Mrs. Prowell to the hospital, had any recollection of the accident at the time of their respective depositions.  Both relied on fire department records prepared contemporaneously with the accident.  

     According to the "E.M.S. Incident Case Report" (EMS Incident Report), prepared by Mr. Florine, upon their arrival at Loretto Hospital, the EMTs removed Mrs. Prowell from the ambulance on the stretcher, which was placed on the ground in the down position.  EMT Florine was closing the ambulance doors when the stretcher rolled about four to five feet, and the front wheels fell into a pothole.  The stretcher fell over on its right side.  Mrs. Prowell was strapped down on the stretcher.  The report did not state where EMT Leen was located during this time, and EMT Leen testified that he did not recall his location. 

     In his deposition, EMT Leen testified that the stretcher that was used to transport Mrs. Prowell was manufactured by Ferno and was referred to as a "two-man" stretcher.  It took two people to move the stretcher or take it in or out of the ambulance.  In order to move it out of or into the ambulance, the legs are completely collapsed underneath it so it has to be physically lifted from the ground into the ambulance or vice-versa from the ambulance back out to the ground.  By pushing either of the handles, located in the middle and the foot of the stretcher, the legs will collapse or drop down.  The legs are interlocked together and have to go up or down together.  There was no way to put the front legs down and still have the back legs engaged in a locked position without the stretcher breaking.  The stretcher did not break in this case.  A person would know if the legs are locked when the stretcher is in the up position because, when the handle is released, the person would feel that the stretcher was going to fall back down again. 

     According to EMT Leen, he had never encountered a situation where the handle was released and the legs came down but did not lock.  As far as he knew that did not happen on June 24, 1997.  In his deposition, EMT Florine testified that he had never heard of a situation where a Ferro two-man stretcher collapsed once it was in the up position.    

     The plaintiffs filed a response to the City's motion for summary judgment.  The plaintiffs argued that a material question of fact existed as to whether the EMTs acted with reckless disregard for Mrs. Prowell's safety.  The plaintiffs relied on the deposition testimony of Mr. McEastland and the deposition testimony of their expert witnesses, Janice Sanchez, R.N., and Dr. David Farkas.  Dr. Farkas testified that the EMTs in this case violated the standard of care of reckless or utter indifference by not having a hand on the stretcher at the time it fell.  Ms. Sanchez testified that the EMTs were willful and wanton or reckless by failing to monitor where Mrs. Prowell's stretcher was located.  

     On July 11, 2001, the circuit court granted the City's motion for summary judgment.  On September 14, 2002, the circuit court denied the plaintiffs' motion to reconsider.  The plaintiffs filed a timely notice of appeal

     The sole issue on appeal is whether the circuit court erred in granting the City's motion for summary judgment.

I. STANDARD OF REVIEW    

     Summary judgment is proper if, and only if, the pleadings, depositions, admissions, affidavits and other relevant matters on file show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  
Smith v. Tri-R Vending
, 249 Ill. App. 3d 654, 657, 619 N.E.2d 172, 174 (1993).  The purpose of summary judgment is not to try a question of fact but to determine if one exists.  
Gilbert v. Sycamore Municipal Hospital
, 156 Ill. 2d 511, 517, 622 N.E.2d 788, 792 (1993).  In determining whether a genuine issue of material fact exists, a court must construe the pleadings, admissions and affidavits strictly against the movant and liberally in favor of the opponent.  
Gilbert
, 156 Ill. 2d at 518, 622 N.E.2d at 792.  A triable issue precluding summary judgment exists where the material facts are disputed or where reasonable persons might draw different conclusions from undisputed facts.  
Gilbert
, 156 Ill. 2d at 518, 622 N.E.2d at 792.  

     The court reviews the granting of a motion for summary judgment 
de
 
novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102, 607 N.E.2d 1204, 1209 (1992).

II. ANALYSIS

A.  The Emergency Services Act

     Section 3.150 of the Emergency Medical Services (EMS) Systems Act (the Act) provides in pertinent part as follows:

     "(a) Any person, agency or governmental body certified, licensed or authorized pursuant to this Act or rules thereunder, who in good faith provides emergency or non-emergency medical services during a Department approved training course, in the normal course of conducting their duties, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions, including the bypassing of nearby hospitals or medical facilities in accordance with the protocols developed pursuant to this Act, constitute willful and wanton misconduct."  210 ILCS 50/3.150 (West 1996).  

B.  Willful and Wanton Misconduct

     In 
American National Bank & Trust Co. v. City of Chicago
, 192 Ill. 2d 274, 735 N.E.2d 551 (2000), our supreme court reiterated its definition of "willful and wanton misconduct":

     "'"A wilful or wanton injury must have been intentional or the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care."' [Citations.]"  
American National Bank & Trust Co.
, 192 Ill. 2d at 285, 735 N.E.2d at 557.

C.  Discussion

     Whether specific acts amount to willful and wanton conduct is ordinarily a question of fact for the jury, and only in an exceptional case will the issue of willful and wanton misconduct be taken from the jury's consideration or be ruled on as a question of law.  
Green v. Chicago Park District
, 248 Ill. App. 3d 334, 341, 618 N.E.2d 514, 518 (1993).

     The plaintiffs contend that the granting of summary judgment to the City was error because the record contains ample evidence that the EMTs in this case were guilty of willful and wanton conduct or reckless disregard in their care of Mrs. Prowell.  According to the plaintiffs, the evidence in the record showed that the EMTs knew that Mrs. Prowell was not secured to the stretcher, that the stretcher's legs were not locked, that the EMTs placed the stretcher on a pothole, making it highly unstable, and that, despite their knowledge of the instability of the stretcher, the EMTs did not maintain physical contact with the stretcher.  The plaintiffs maintain that these acts rose above mere negligence to willful and wanton conduct.

     The City responds that the record contains two scenarios as to how the accident in this case occurred.  Under the first scenario, based upon the testimony of Mr. McEastland, the stretcher collapsed, causing it to tilt and Mrs. Prowell to slide down the stretcher head-first.  According to Mr. McEastland, one EMT stated to the other that he had told the other EMT that the legs were not locked and the other EMT responded that he thought that they had been.  Under the second scenario, based on the EMS Incident Report, when EMT Florine turned to close the door to the ambulance, the stretcher rolled, one of the front wheels fell into a pothole, and the stretcher tipped over.  

     The City maintains that regardless of which scenario is accepted, the EMTs' actions did not rise to the level of willful and wanton conduct.

     As noted above, willful and wanton conduct is not confined to intentional acts, but may also consist of a reckless disregard for the safety of others.  Such a reckless disregard may be found where a person is aware of an impending danger but fails to prevent it when it could have been prevented by the use of ordinary care.  Reckless disregard may also be found where the person failed to discover the danger which could have been discovered through the use of ordinary care.  
American National Bank & Trust Co.
, 192 Ill. 2d at 285, 735 N.E.2d at 557.   The failure to discover must have been committed under circumstances exhibiting a reckless disregard for the safety of others.  
Bowden v. Cary Fire Protection District
, 304 Ill. App. 3d 274, 280, 710 N.E.2d 548, 552 (1999).

     In 
Bowden
, the plaintiff alleged that the EMTs were guilty of willful and wanton conduct when they failed to force oxygen into the decedent's lungs, failed to contact the hospital to request permission to intubate or to administer asthma medication, and failed to properly intubate the decedent after being instructed to do so.  In upholding summary judgment for the defendant, the reviewing court concluded that the acts of the EMTs did not rise to the level of willful and wanton conduct.  The court noted that the EMTs had provided extensive care and treatment to the decedent, and that even if the plaintiff's allegations were believed by the jury, such testimony would only establish negligence.  The court concluded that in light of the extensive treatment provided by the EMTs, there was simply no evidence that they showed an utter disregard to the decedent's safety.  
Bowden
, 304 Ill. App. 3d at 282, 710 N.E.2d at 553.

     In the present case, upon arrival at Mrs. Prowell's residence, the EMTs examined her and determined that she needed to be hospitalized.  Mrs. Prowell was removed from her residence strapped to the stretcher and transported a short distance to  Loretto Hospital.  At some point prior to her arrival at the hospital, Mrs. Prowell was placed on oxygen and given an intravenous line.  Upon arrival at the hospital, Mrs. Prowell was removed from the ambulance on the stretcher, whereupon the accident occurred.  According to Mr. McEastland, the EMTs attempted to catch Mrs. Prowell as she slid off the stretcher.   

     We note that in 
Bowen
, the reviewing court determined as a matter of law that the actions of the EMTs in that case were not willful and wanton, even in light of the factual discrepancy between the plaintiff's testimony that the EMTS failed to secure the oxygen mask and were inept in their efforts to place the decedent on the stretcher and the testimony of the EMTs.  

     
The evidence in the present case presents questions of fact as to whether the EMTs in this case had actual knowledge that the stretcher was not secure when they moved it, based on the testimony of both Wayne Prowell and Mr. McEastland as to the conversation between the two EMTs following the accident.  The fact that the EMTs in this case attempted to move the stretcher in light of the warning that the stretcher was not secure presents a question of fact as to whether, having been warned, their failure to check the stability of the stretcher established recklessness sufficient to constitute willful and wanton conduct.  In contrast, in 
Bowen
, the factual questions concerned the quality of the EMTs' efforts to provide care to the decedent.

     In addition, both of the plaintiffs' expert witnesses concluded that the conduct of the EMTs in leaving Mrs. Prowell unattended on the stretcher was reckless.

     The City argues in response that where there is no factual support for an expert's conclusions, those conclusions alone do not create a question of fact.  
Damron v. Micor Distributing, Ltd.
, 276 Ill. App. 3d 901, 907, 658 N.E.2d 1318, 1322 (1995).  

     Ms. Sanchez opined that, in this case, by not physically touching the stretcher, the EMTs were not in attendance of Mrs. Prowell.  She noted that, after Mrs. Prowell was removed from the ambulance, one EMT was taking care of the ambulance door, which left the other EMT responsible for the patient's safety.  However, according to their depositions, neither EMT was next to the stretcher when it was removed from the ambulance, being either four or five feet or four or five inches away from the stretcher.  The stretcher used did not have brakes.  Therefore, the EMTs were willful and wanton or reckless in failing to monitor where Mrs. Prowell's stretcher was located.

     In his deposition, Dr. Farkas testified that his definition of leaving a patient "unattended" did not rest on the distance but, rather, on the type of patient or care being given the patient.  In the instant case, Dr. Farkas opined that the EMTs violated the standard of care by not having their hands on the stretcher.
(footnote: 4)   While, based upon what Dr. Farkas had read, Mrs. Prowell remained strapped to the stretcher, the fact remained that her head struck the pavement due to the "instability of the - of her and/or the stretcher."  

     Contrary to the City's argument, the record presents a question of fact as to whether the EMTs left Mrs. Prowell unattended.  EMT Leen testified that he did not recall where he was when the accident occurred, and according to the EMS
 
Incident Report, EMT Florine was closing the ambulance doors.  Yet, according to Mr. McEastland's testimony, the stretcher was moving with one EMT at the head and one at the foot, when the accident happened.  Finally, according to the EMS Incident Report, the stretcher rolled into a pothole.  Even if the EMTs' version of the accident is accepted, it raises a question of fact as to how the stretcher could have rolled into the pothole if at least one of the EMTs had been in contact with it.

     
We conclude that genuine issues of material fact exist as to whether the EMTs in this case had actual knowledge that the stretcher in this case was in an unstable condition but chose to move Mrs. Prowell or leave her unattended regardless of the risk
.       Accordingly, we reverse the granting of the motion for summary judgment and remand for further proceedings.

     Reversed and remanded.

     SOUTH, P.J., and HOFFMAN, J., concur.

     

     

     

     

     

     

FOOTNOTES
1:
The plaintiffs settled with Loretto Hospital, and the hospital is not a party to this appeal.

2:
Although the plaintiffs refer to the acts of the EMTs as negligence, count III was captioned "WRONGFUL DEATH/WILLFUL AND WANTON CONDUCT."

3:
In his testimony, Mr. McEastland referred to the stretcher as a "gurney."  

4:
The City maintains that the violation of a standard of care is not willful and wanton conduct.  However, earlier in his deposition, Dr. Farkas was questioned about the applicable legal standard in a paramedic malpractice case.  The doctor testified that "there's a whole other area that's so far beyond not doing [the EMTs'] job or not doing their job in a careful manner that in my lay terminology I would say is reckless or utter indifference."