JOHN DOE, Plaintiff-Appellant, v. ROBERT BROUILLETTE, a/k/a Robert Sullivan, *et al.*, Defendants (The Archdiocese of Chicago, Defendant-Appellee).

First District (1st Division) No. 1—07—0633

Opinion filed March 31, 2009.

Thomas A. Clancy, Jeanine L. Stevens, and Joshua S. Stern, all of Clancy & Stevens, of Chicago, for appellant.

Lawrence R. Smith and Michael Resis, both of SmithAmundsen LLC, of Chicago, for appellee.

JUSTICE HALL delivered the opinion of the court:

The plaintiff, John Doe, filed a multicount complaint against the defendant, the Archdiocese of Chicago,[1] alleging that he was sexually molested by a guidance counselor at a Catholic high school. The trial court granted summary judgment to the Catholic Bishop on the grounds that the guidance counselor was not an employee of the Catholic Bishop.

The plaintiff appeals, asserting that genuine issues of material fact exist precluding summary judgment. The plaintiff raises the following specific issues: (1) whether the circuit court erred in finding that the plaintiff failed to present any evidence of reliance to support an apparent agency claim; (2) whether a genuine issue of material fact existed as to whether Brother Brouillette was an employee or agent of the Catholic Bishop; (3) whether the plaintiff may assert a cause of action for breach of fiduciary duty; (4) whether a "special relationship" existed between the plaintiff and the Catholic Bishop requiring the Catholic Bishop to protect the plaintiff from the criminal acts of a third party; and (5) whether the plaintiff stated causes of action for fraudulent concealment and civil conspiracy.

---

[1]Defendant maintains that it was incorrectly sued as the Archdiocese of Chicago and that the correct name is the Catholic Bishop of Chicago. We will refer to the defendant as the Catholic Bishop.

On April 16, 2003, the plaintiff filed his fifth amended complaint against the Catholic Bishop, Brother Robert Brouillette, the Congregation of the Christian Brothers (the Christian Brothers), and St. Laurence High School (St. Laurence). The plaintiff alleged that St. Laurence was owned by the Catholic Bishop. The plaintiff alleged that, during his freshman and sophomore years at St. Laurence, 1996 to 1998, he was sexually molested by Brother Brouillette, who had served as his guidance counselor and mentor. The plaintiff further alleged that it was not until 2002 that he realized that he had been injured by his sexual contact with Brother Brouillette.

In count II of his fifth amended complaint, the plaintiff alleged that the Catholic Bishop was negligent in hiring Brother Brouillette in that it knew or should have known of his history of pedophilia and therefore failed to exercise reasonable care in hiring Brother Brouillette to provide counseling and mentoring to children. In count V, the plaintiff alleged that the Catholic Bishop had been placed on notice of Brother Brouillette's history of pedophilia but failed to supervise him, allowing him to perform services as a teacher and guidance counselor. In count VIII, the plaintiff alleged that the Catholic Bishop violated the Sexual Exploitation in Psychotherapy, Professional Health Services, and Professional Mental Health Services Act (740 ILCS 140/1 *et seq.* (West 2002)) (the Act) by allowing Brother Brouillette to provide counseling services to the plaintiff while sexually molesting him.

In count XII, the plaintiff alleged that, as an educational and religious association, the Catholic Bishop owed a fiduciary duty to the plaintiff. The plaintiff further alleged that the Catholic Bishop violated its duty to the plaintiff by its policy of tolerance of Brother Brouillette's sexual misconduct. Finally, in count XV, the plaintiff alleged that the Catholic Bishop engaged in a conspiracy to suppress Brother Brouillette's history of pedophilia and falsely represented that Brother Brouillette was an appropriate teacher, a fact on which the plaintiff and his family relied.

The Catholic Bishop filed an answer to the fifth amended complaint asserting that, while St. Laurence was a Catholic high school, the Catholic Bishop did not own, operate or control the school. The Catholic Bishop denied that Brother Brouillette was its agent or employee.

On April 30, 2004, the Catholic Bishop filed a motion for summary judgment asserting the statute of limitations set forth in section 13—202.2 of the Code of Civil Procedure (735 ILCS 5/13—202.2 (West 2002)). In its motion, the Catholic Bishop reserved the right to assert that it did not exercise any control over St. Laurence or the Christian Brothers or that Brother Brouillette was not its agent or employee or

under its control. Following the filing of the Catholic Bishop's motion for summary judgment, Brother Brouillette and the Christian Brothers reached settlement agreements with the plaintiff and were dismissed by the circuit court.[2]

Subsequently, the Catholic Bishop filed a supplementary motion for summary judgment. In its motion, the Catholic Bishop asserted that it was entitled to summary judgment because no question of material fact existed as to whether Brother Brouillette was its employee or agent or under its control. The Catholic Bishop further maintained that tort duties may not be imposed based on the interpretation of religious doctrine. The Catholic Bishop also maintained that, under Illinois law, there is no cause of action for breach of fiduciary duty between a cleric and a church member and that no special relationship existed to allow the imposition of a duty to protect the plaintiff from a criminal act. Finally, the Catholic Bishop asserted that the plaintiff failed to properly allege his fraudulent concealment and civil conspiracy claims. The following evidence taken from deposition testimony and affidavits is pertinent to the issues raised in this appeal.

Sister Margaret Rose Farley, the Catholic Bishop's director of school personnel, testified that there were two types of high schools located within the Archdiocese of Chicago: those sponsored by religious communities and those sponsored by the archdiocese. A school sponsored by a religious organization is owned and operated by that organization with its own specific mission and purpose and financial liability. Schools sponsored by the archdiocese are part of the corporation of the archdiocese (the Catholic Bishop), and it is responsible for them. St. Laurence is sponsored by the Christian Brothers.

According to Sister Farley, the cardinal must give permission before a Catholic school can be established within the geographic limits of the archdiocese. The cardinal could also revoke that permission. The cardinal was the ultimate authority for all Catholic activity in the archdiocese, including what is conducted by religious orders and schools. The cardinal would not fire a teacher for teaching something against the Catholic faith, but he could call for an investigation. While the cardinal does not have the right to investigate charges of sexual misconduct between a member of a religious order and a student, he has the right to ensure that it is investigated.

---

[2]While there are references in the record that St. Laurence also reached a settlement with the plaintiff, a copy of the order dismissing St. Laurence could not be located in the record.

Sister Farley did staff recruitment for the whole Catholic school system. The Catholic Bishop did not have a role in the operation, such as salary scale or budget, of a nonarchdiocesan Catholic school such as St. Laurence.

Thomas J. Ondrla, currently president of St. Laurence, was principal of the school from 1993 to 2000. St Laurence was a school in the archdiocese but was not an archdiocesan school. The cardinal would have some oversight in religious matters; the school's right to call itself Catholic was at the cardinal's discretion. Mr. Ondrla did not know if the Catholic Bishop had the right to involve itself in an investigation or discipline of a teacher at St. Laurence. The "archbishop" was not expected to conduct daily supervision of the activities at the school. Mr. Ondrla agreed that the cardinal was responsible for the moral and spiritual welfare of the students attending schools in the geographic area of the archdiocese.

Mr. Ondrla testified further that there was a liaison person between the Office of Catholic Schools and St. Laurence who transferred information and attended the monthly council meetings held by the high schools. There was no requirement that St. Laurence personnel attend the monthly council meetings. None of the policies and procedures of the Catholic Bishop between 1994 and 1999 applied to St. Laurence.

Mr. Ondrla acknowledged that information was collected from St. Laurence by the Catholic Bishop by way of surveys filled out by personnel at St. Laurence. The information was used by the Catholic Bishop to make general statements regarding the test scores in the Catholic high schools in the archdiocese. The survey required St. Laurence to provide information about the duties performed by paid personnel, all monies received by the school, the salaries and related costs and other types of information to aid the Catholic Bishop's planning efforts for fund-raising.

St. Laurence was required to pay a fee to the Catholic Bishop for each student to defray the costs of the Office of Catholic Schools for services and workshops in which the schools participated. St. Laurence could still call itself a Catholic school even if it did not pay the annual assessment for each student.

Mr. Ondrla denied that St. Laurence took out a loan with the Catholic Bishop. The Catholic Bishop had entered into an agreement to purchase natural gas for the archdiocese; it was made available to grammar schools and high schools. The Catholic Bishop was not providing natural gas to the schools without cost. Rather, it saved the schools money if they purchased the natural gas through the Catholic Bishop. When the gas prices escalated, the Catholic Bishop offered to

convert the normal reconciliations to no-interest loans. Mr. Ondrla acknowledged that a letter from Cardinal George listed St. Laurence as a Catholic secondary school and indicated that it was a part of the Archdiocese of Chicago.

In an affidavit, Maureen O'Brien, director of real estate for the Catholic Bishop, averred that the Catholic Bishop deeded the property on which St. Laurence was built to the Christian Brothers in 1961. She further averred that the Catholic Bishop did not own, operate or control St. Laurence.

Fred J. Van Den Hende, the Catholic Bishop's director of human resources, testified that the cardinal has some authority over any institution within the geographic boundaries of the archdiocese that calls itself Catholic, if he feels that it is not following the teachings of the Church. The cardinal did not have the right to name and approve teachers at nonarchdiocesan schools. The witness was uncertain whether the cardinal had the authority to remove religion teachers from such a school; it could depend on circumstances of which the witness was unaware.

The Catholic Bishop did not provide any financial assistance to St. Laurence. According to the Catholic Bishop's employee database, Brother Brouillette was not on the Catholic Bishop's payroll. Mr. Van Den Hende acknowledged that, due to its size, the database was not accurate or complete. However, there was no record of Brother Brouillette receiving benefits; those records were more complete for religious employees than lay employees. The Catholic Bishop never provided human resource services to nonarchdiocesan schools. A search revealed no personnel file for Brother Brouillette in the human resources office. Religious high schools were not tied by policy to the Catholic Bishop, and the Catholic Bishop had no right to hire or fire employees of a religious (order) high school.

Brother Donald Houde is a member of the Clerics of St. Viator and had served as principal of St. Viator High School and Spalding Institute, also a high school. He was certified by the State of Illinois as a school administrator and had been employed by the Catholic Bishop as curriculum director in what is now known as the Office of Catholic Schools. He later became director of administrative affairs. His duties included being in charge of the budget and marketing of Catholic schools and serving as spokesperson for the Office of Catholic Schools.

Brother Houde testified that members of a religious order, such as the Christian Brothers, were not directly responsible to the cardinal or local bishop as diocesan priests were but were responsible through their superiors. A Catholic school seeking to be established within the geographical confines of the archdiocese required the permission of

the Catholic Bishop. However, he had never seen anything in writing giving such permission.

According to Brother Houde, the cardinal's purview would be Catholic dogma and would extend to all Catholic schools located within the geographical confines of the Archdiocese of Chicago. The teaching and operating of nonarchdiocesan schools were not subject to governance by the Catholic Bishop. The cardinal would not directly remove a teacher; it would be done through the superiors of the religious order.

Brother Houde explained the difference between the two types of high schools as follows:

"Archdiocesan high schools or schools sponsored by the Archdiocese of Chicago—and there are a few of them—are more directly administered through the Office of Catholic Education.

The private schools are just that; they—they're in—they're totally independent in their operation. An archdiocesan school, the principal, curriculum, administration of the school is supervised more directly through the Office of Catholic Education.

In the pri—I was an administrator of a high school. I—and our local team were independent. We hired, fired, evaluated everything on our own. The principals of the archdiocesan school are hired through the Office of Catholic Education, and the contracts were signed by the superintendent of schools."[3]

Brother Houde further explained that in the event a nonarchdiocesan high school was not following Catholic dogma, the facts would be investigated. The cardinal or someone from his office and the superintendent would be involved, and it could result in the dismissal of the teacher.

The circuit court granted the Catholic Bishop's supplementary motion for summary judgment.[4] The court found that the Catholic Bishop and the Christian Brothers were separate corporations. It found that there was no evidence that the Catholic Bishop was in control of the hiring, supervision or retention of employees at St. Laurence. The court further found that there was no evidence of reliance to support an apparent agency claim.

The plaintiff filed a timely notice of appeal.

## ANALYSIS

The plaintiff contends that genuine issues of material fact preclude summary judgment for the Catholic Bishop.

---

[3]The witness clarified that "private schools" referred to those run by religious orders.

[4]The circuit court did not rule on the statute of limitations defense.

## I. Standard of Review

The court reviews an order granting summary judgment under the *de novo* standard of review. *Luise, Inc. v. Village of Skokie*, 335 Ill. App. 3d 672, 678, 781 N.E.2d 353 (2002). "Summary judgment is proper if, and only if, the pleadings, depositions, admissions, affidavits and other relevant matters on file show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Prowell v. Loretto Hospital*, 339 Ill. App. 3d 817, 822, 791 N.E.2d 1261 (2003). In determining whether a genuine issue of material fact exists, the pleadings, admissions and affidavits are construed strictly against the movant and liberally in favor of the nonmovant. *Prowell*, 339 Ill. App. 3d at 822. "A triable issue precluding summary judgment exists where the material facts are disputed or where reasonable persons might draw different conclusions from undisputed facts." *Prowell*, 339 Ill. App. 3d at 822.

## II. Discussion

### A. *Apparent Agency*

The plaintiff contends that the circuit court erred when it found that the plaintiff had failed to prove the element of reliance with regard to an apparent agency claim.

■ Apparent authority arises when the principal holds an agent out as possessing the authority to act on its behalf. *Letsos v. Century 21-New West Realty*, 285 Ill. App. 3d 1056, 1065, 675 N.E.2d 217 (1996). "To prove the existence of apparent authority, the proponent must show: (1) the principal consented to or knowingly acquiesced in the agent's exercise of authority; (2) based on the actions of the principal and agent, the third person reasonably concluded that the party was an agent of the principal; and (3) the third person justifiably relied on the agent's apparent authority to his detriment." *Letsos*, 285 Ill. App. 3d at 1065. The plaintiff need not specifically plead apparent agency; the issue can be considered where the plaintiff has alleged an agency or employee relationship. *Casey v. Forest Health System, Inc. of Illinois*, 291 Ill. App. 3d 261, 264, 683 N.E.2d 936 (1997).

When a defendant moves for summary judgment, he bears the initial burden of production. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624, 872 N.E.2d 431 (2007). That burden may be met by either affirmatively showing that some element of the case must be resolved in the defendant's favor or by establishing that there is no evidence to support the nonmovant's case. *Nedzvekas*, 374 Ill. App. 3d at 624. In order to establish that the plaintiff has provided insufficient evidence to prove an essential element, a defendant must do more than argue

the absence of the evidence. *Nedzvekas*, 374 Ill. App. 3d at 624. Once the movant satisfies his initial burden, the burden shifts to the non-movant to present a factual basis to entitle it to a favorable judgment. *Nedzvekas*, 374 Ill. App. 3d at 624.

The plaintiff acknowledges that he did not offer any evidence on the issue of reliance. However, he argues that because discovery was not complete and the Catholic Bishop failed to offer any evidence on the issue of apparent agency, he was entitled to rely on his complaint. *Williams v. Covenant Medical Center*, 316 Ill. App. 3d 682, 689, 737 N.E.2d 662 (2000).

The Catholic Bishop does not argue that it presented evidence on the issue of reliance in its supplemental motion for summary judgment and does not argue that the plaintiff failed to plead reliance in his complaint. The Catholic Bishop responds that the plaintiff's settlement with Brother Brouillette and the Christian Brothers extinguished any potential vicarious liability that it had as the alleged principal. See *Illinois State Bar Ass'n Mutual Insurance Co. v. Coregis Insurance Co.*, 355 Ill. App. 3d 156, 163, 821 N.E.2d 706 (2004) (this court may sustain the circuit court's decision on any basis in the record).

Our supreme court has held that a settlement between an agent and the plaintiff extinguishes the principal's vicarious liability. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 528, 622 N.E.2d 788 (1993). For example, in *Casey*, the plaintiff alleged that the hospital was liable for the negligence of the doctor. While finding that the plaintiff did not need to specifically allege an apparent authority theory, the court upheld summary judgment for the hospital based on the plaintiff's settlement with the doctor. *Casey*, 291 Ill. App. 3d at 264.

The fact that the settlement orders in this case provided that the settlements did not affect the plaintiff's causes of action against the Catholic Bishop did not preserve them. As the court in *Gilbert* held, the above rule "stands regardless of whether the plaintiff's covenant not to sue the agent expressly reserves the plaintiff's right to seek recovery from the principal." *Gilbert*, 156 Ill. 2d at 528-29.

The Catholic Bishop acknowledges that the torts of negligent hiring and negligent supervision do not require the wrongful act of the employee. *Young v. Lemons*, 266 Ill. App. 3d 49, 52, 639 N.E.2d 610 (1994). To the extent that the plaintiff's claims do not require the wrongful act of Brother Brouillette, they will be addressed below.

## B. *Negligent Hiring and Negligent Supervision*

▪ A claim for negligent hiring requires the plaintiff to prove that the employer knew or should have known that the person hired "had

a 'particular' unfitness for the job that would create a foreseeable danger to others" and that "this particular unfitness was the proximate cause of the plaintiff's injury." *Strickland v. Communications & Cable of Chicago, Inc.*, 304 Ill. App. 3d 679, 682, 710 N.E.2d 55 (1999). "In order to hold an employer liable for injuries resulting to third persons from negligent training or supervision of an employee, it must be established 'that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, having this knowledge, failed to supervise the employee adequately, or take other action to prevent the harm.' " *Vancura v. Katris*, 391 Ill. App. 3d 350, 366, 907 N.E.2d 814 (2008), quoting 30 C.J.S. *Employer—Employee* §205, at 255 (2007).

■ This court has recognized that there is no rigid rule for determining whether a person is an agent or employee or an independent contractor. *Lang v. Silva*, 306 Ill. App. 3d 960, 715 N.E.2d 708 (1999). The following factors may be considered in making that determination: "the right to control the manner in which the work is performed; the right to discharge; the method of payment; whether taxes are deducted from the payment; the level of skill required to perform the work; and the furnishing of the necessary tools, materials, or equipment." *Lang*, 306 Ill. App. 3d at 972. While no one single factor is considered determinative, the right to control the work is considered to be the predominant factor. *Lang*, 306 Ill. App. 3d at 972. The right to discharge may be indicative of the right to control. See *Gunterberg v. B&M Transportation Co.*, 27 Ill. App. 3d 732, 738, 327 N.E.2d 528 (1975). Finally, it is the right to control rather than the actual exercise of control that is significant. *Gunterberg*, 27 Ill. App. 3d at 738.

The question of whether one is an agent or employee or an independent contractor is generally a question of fact. *Lang*, 306 Ill. App. 3d at 972-73. The question may be decided as a matter of law where the relationship is so clear as to be indisputable. *Lang*, 306 Ill. App. 3d at 973.

### 1. Whether This Issue Requires Interpretation of Religious Doctrine or Duties

■ The Catholic Bishop maintains that in order to determine whether it had the right to discharge Brother Brouillette, this court would first have to determine whether the cardinal had a duty under canon law to remove Brother Brouillette and whether he deviated from that duty. The Catholic Bishop notes correctly that Illinois courts will decline to entertain cases involving the interpretation of religious doctrine. See *Baumgartner v. First Church of Christ, Scientist*, 141 Ill. App. 3d 898, 904, 490 N.E.2d 1319 (1986).

Illinois courts may entertain lawsuits alleging tortious conduct by churches and their employees, so long as the resolution does not require interpretation of either religious doctrine or religious duties imposed on an individual by a particular church. *Amato v. Greenquist*, 287 Ill. App. 3d 921, 926, 679 N.E.2d 446 (1997); see *Bivin v. Wright*, 275 Ill. App. 3d 899, 656 N.E.2d 1121 (1995) (the dispute must be resolved by applying neutral legal principles, using purely secular analysis without relying on religious precepts).

In *Softcheck v. Imesch*, 367 Ill. App. 3d 148, 855 N.E.2d 941 (2006), the plaintiffs alleged they had been sexually abused by priests at a parish school. The complaint alleged that the defendants had assured the plaintiffs that participation in these acts were in keeping with the teachings of the church. While the reviewing court affirmed the dismissal of the complaint as untimely, the court also held that the allegations of the complaint did not require the court to "pass judgment" on church doctrine. The court pointed out that the trier of fact's determination was limited to whether the church taught what the plaintiffs alleged it taught; the trier of fact could find that the plaintiffs believed what the church taught, without having to determine whether the beliefs were valid or acceptable. *Softcheck*, 367 Ill. App. 3d at 158.

The Catholic Bishop does not claim that Brother Brouillette's sexual activity with the plaintiff was sanctioned or condoned by church doctrine. See *Bivin*, 275 Ill. App. 3d at 902. Therefore, resolution of this issue does not require interpretation of church doctrine and does not bar resolution of the plaintiff's negligent hiring or supervision causes of action.

## 2. The Right to Control

The plaintiff argues that the circuit court's finding that there was no evidence that the Catholic Bishop was in control of hiring, supervising or retaining the employees at St. Laurence was contradicted by the evidence he offered. As a result, the plaintiff maintains, a genuine issue of material fact existed preventing summary judgment.

As evidence that the Catholic Bishop had the right to control St. Laurence and/or Brother Brouillette, the plaintiff points out that the Christian Brothers required the cardinal's permission to start a Catholic School. The plaintiff further points out that the Catholic Bishop required St. Laurence to complete surveys providing it with information about the students and the operation of the school, that St. Laurence was required to pay an assessment fee per student to the Catholic Bishop and that the Catholic Bishop had provided an interest-free loan to St. Laurence. The plaintiff also argues that the finding

that the Catholic Bishop and St. Laurence were separate corporations does not prevent this court from determining that the Catholic Bishop exercised control over St. Laurence and, therefore, Brother Brouillette. See *Slates v. International House of Pancakes, Inc.*, 90 Ill. App. 3d 716, 725, 413 N.E.2d 457 (1980) (where one corporation so controls the affairs of another that the two corporations are essentially one, the corporate entities will be ignored and service on one corporation is effective as to the other).

The Catholic Bishop relies on *Oliveira-Brooks v. Re/Max International, Inc.*, 372 Ill. App. 3d 127, 865 N.E.2d 252 (2007). In that case, the various agreements between the plaintiff-franchisee and defendant-franchisor were intended to exclude any possibility of an agency relationship between the two. However, as the reviewing court noted, "the declaration of the parties is not controlling where the conduct of the parties demonstrates the existence of an agency relationship." *Oliveira-Brooks*, 372 Ill. App. 3d at 134. The court upheld summary judgment for the defendant as there was no evidence the defendant controlled its franchisees so as to be liable for their conduct. While the defendant promulgated polices and procedures intended for franchisees, "there [was] no evidence that it retained the right to control the specific means and manner by which Re/Max Midtown sales associates conduct their day-to-day real estate activities so as to negate Re/Max International's intent [to exclude the possibility of an agency relationship]." *Oliveira-Brooks*, 372 Ill. App. 3d at 135. Similarly, in *Slates*, the agreement between the parties provided that they were to be independent contractors. Nonetheless, the court looked beyond that provision to the whole agreement between the parties to determine whether an agency relationship existed. The court found the right to control necessary to establish an agency relationship lacking despite the franchisor's power to promulgate operational procedures manual, franchisor's training and supervision of franchisees, quality control, record keeping, periodic inspections, appearance of the premises and hours of operation, employees' appearances and demeanor. *Slates*, 90 Ill. App. 3d at 726-27.

It is the plaintiff's burden to prove the existence of an agency relationship and the scope of the authority he seeks to impose on the principal. *Oliveira-Brooks*, 372 Ill. App. 3d at 134. While there is no contract or agreement between the Catholic Bishop and St. Laurence defining their relationship, we find it significant that the evidence failed to establish that the Catholic Bishop exercised any day-to-day control over the operation of St. Laurence. In his testimony, Mr. Ondrla explained that the archbishop/cardinal was not expected to conduct daily supervision of the activities at the school. The surveys

were used to provide information to the Catholic Bishop for fundraising purposes. There is no evidence that the Catholic Bishop used the information gleaned from the surveys to control the day-to-day operations of St. Laurence. The per-student assessment fee was used to pay for programs and seminars. While Mr. Ondrla acknowledged that the right of a school to call itself "Catholic" was at the cardinal's discretion, St. Laurence's right to call itself "Catholic" was not dependent on the school's payment of the per-student assessment.

Finally, the existence of a debtor-creditor relationship between the Catholic Bishop and St. Laurence did not indicate that it employed Brother Brouillette or exercised any control over St. Laurence. In *Seidmon v. Harris*, 172 Ill. App. 3d 352, 358, 526 N.E.2d 543 (1988), the court held that evidence of a promissory note indicated the existence of a debtor-creditor relationship rather than a partnership.

The plaintiff then maintains that the deposition testimony, particularly that of Brother Houde and Sister Farley, established that the Catholic Bishop had the power to discharge Brother Brouillette. We have quoted extensively from the depositions of these witnesses in order to determine whether they support the plaintiff's position.

In his deposition, Brother Houde was questioned as follows:

"Q. Do you have an understanding of whether members of the Congregation of Christian Brothers are considered mene religious?

A. Yes.

Q. When you said that mene religious are not—that the archdiocese would not be directly responsible for mene religious, would they be indirectly responsible?

A. I think a member of a mene's religious community is responsible to, say, the cardinal archbishop through their provincial or their superiors.

* * *

Q. Does the Archbishop have the ability to remove religious teachers, if it's required, for any reason, religious or immorals?

MR. SMITH (the Catholic Bishop's attorney): Just so we're clear, what schools are you talking about?

MR. STERN (the plaintiff's attorney): Schools located within the geographical confines of the Archdiocese of Chicago.

THE WITNESS: He wouldn't be doing it directly. He would do— if anything dramatic like that came up, it would be through the superiors of the religious.

BY MR. STERN:

Q. When you say 'of the religious,' would this be—

A. Of the person, the member of the religious order.

Q. This would also include the Congregation of Christian Brothers?

A. Yes. Yeah.

Q. Do you know of anytime, whether directly or indirectly, whether the archbishop removes a religion teacher for any reason?

A. No. No.

\* \* \*

Q. If a nonarchdiocesan secondary school was not following Catholic dogma, what steps would be taken to remedy that?

A. Well, first of all, you know, you'd have to discover the data, the facts of the case. And that would—that would probably involve someone from the cardinal's—the cardinal or someone from his office and then the superintendent of schools. It would all be the higher-ups in terms of dealing with it, eventually coming down to—if it's a lay teacher, you know, giving us a plan of how you're going to deal with this problem. We—our investigation shows this and this to be true. You know, if it's all factual, either dismissal of that teacher or, you know, mending the program—mending the problem somehow."

At her deposition, Sister Farley was questioned as follows:

"Q. Have you learned, in your position within the archdiocese, that the bishop or cardinal is the ultimate authority for all Catholic activity that goes on in his archdiocese, including that which is conducted by religious orders and schools?

A. What do you mean by 'Catholic activity'? Do you mean the teachings of Catholic religion?

Q. Correct.

A. Yes, that is the jurisdiction of the cardinal.

Q. Does the Archdiocese of Chicago play any role over the teaching and operation of non-archdiocesan Catholic schools?

\* \* \*

A. The cardinal has the right to oversee the teaching of Catholic religion in any Catholic school located in the Archdiocese of Chicago.

Q. When you say 'oversee,' what do you mean?

A. They can't teach things contrary to the Catholic faith and dogma.

Q. If a teacher in a Catholic school is teaching something that goes against Catholic faith or Catholic dogma, what steps can the cardinal do to rectify that?

A. He would have it investigated.

Q. And if he investigated it and found it was, indeed, true, what steps could he take?

A. He would probably—I'm speculating.

He would probably—if that was verified, he would have—or contact the religious community that sponsors the school.

Q. Could he have the teacher fired?

A. Well, a teacher could be fired, because, I mean, at least in the diocesan schools, there's a contract that says to teach and act within the teachings of the church.

\* \* \*

Q. A teacher that teaches at a non-archdiocesan Catholic school, can the cardinal have the teacher fired for teaching something against Catholic faith or Catholic dogma?

A. He wouldn't fire them, but he could influence the school to fire them.

\* \* \*

Q. When you say 'influence' though, what do you mean by 'influence'?

A. Say 'I want you to look into your school, and I want you to look at the religion program or what's going on,' and whatever.

Q. Could he force them to take certain action?

A. That's speculating. I would think he could, has the power to.

\* \* \*

Q. Does the archbishop have the right to name and approve teachers of religion at non-archdiocesan Catholic schools?

\* \* \*

A. No, he does not.

Q. Does the Archbishop of Chicago have the ability to involve himself in the investigation or discipline of a member of a men's religious community as it relates to immoral activity toward a student?

\* \* \*

THE WITNESS: Not to investigate.

He does not have the right to investigate, but he has the right to insure that it is investigated.

BY MR. STERN: And what powers does he have to ensure that it is investigated?

A. If he got information about a possible allegation, the office for religious would call the congregation and inform them and tell them to use their policies to investigate it and get back to us, how it worked out.

Q. And that would include immoral activity toward a student of a non-archdiocesan Catholic school?

A. Yes.

The office for religious would inform them of information we got and tell—and they (the religious order) would investigate it. They all have policies.

\* \* \*

Q. That's not something that would be investigated by the Office of Catholic Schools?

A. No.

We wouldn't investigate any of those, no matter who it was. We have other offices that help people investigate."

Brother Houde's testimony quoted above established that the Catholic Bishop's power to discharge a teacher was limited to situations in which a "lay" teacher was not teaching in accordance with Catholic dogma. While Brother Houde testified that the religious order was responsible indirectly to the cardinal, the plaintiff never established that such indirect responsibility meant that the cardinal could take the direct action of discharging a teacher at a nonarchdiocesan school.

Likewise, Sister Farley's testimony established that the Catholic Bishop exercised no control over a nonarchdiocesan Catholic School, such as St. Laurence, in matters unrelated to the teaching of Catholic dogma. Even in the case of sexual misconduct involving a student and a member of a religious order, the Catholic Bishop's role was limited to calling for an investigation. The investigation would be conducted by the religious order and handled according to their policies. Sister Farley's testimony established that the Catholic Bishop had no right to name and approve teachers at a nonarchdiocesan school. Her reference to the cardinal's ability to discharge a teacher was in connection with an archdiocesan school and was based on the provisions of the teacher's contract with the school. Nothing in her testimony established a corresponding ability to discharge a teacher at a nonarchdiocesan Catholic school.

In summary, the deposition testimony in this case established that there was a clear distinction between archdiocesan schools, run by the Catholic Bishop, and those schools, like St. Laurence, that were run by a religious organization, such as the Christian Brothers. At a nonarchdiocesan Catholic school, the cardinal's authority was confined to the area of Catholic dogma and limited to calling for an investigation and "influencing" a decision by the governing board. Even in the area of sexual misconduct by a member of a religious order, the matter was handled by the religious order, not the Catholic Bishop. Most significantly, there was no evidence that the Catholic Bishop had or exercised any control over the day-to-day management of a nonarchdiocesan school such as St. Laurence.

■ Construing the deposition testimony liberally in favor of the plaintiff, any indication that the Catholic Bishop had the right to discharge a teacher, such as Brother Brouillette, at a nonarchdiocesan

school was indirect at best and only operated in matters involving the Catholic religion or dogma. We conclude that the plaintiff has failed to raise a genuine issue of material fact as to whether Brother Brouillette was an agent or employee of the Catholic Bishop. While we have singled out Brother Houde's and Sister Farley's deposition testimony, we have also considered the deposition testimony of the other witnesses and find that it supports our conclusion. Therefore, summary judgment as to counts II and V of the fifth amended complaint was proper.

## C. *Violation of the Act*

■ In count VIII, the plaintiff alleged that the Catholic Bishop held out Brother Brouillette as a trained psychological counselor and that it violated the Act by failing to take reasonable action to protect the plaintiff from Brother Brouillette's improper sexual advances. The plaintiff further argues that his claim against the Catholic Bishop is not dependant upon Brother Brouillette's violation of the Act, maintaining that the Act gave him an independent cause of action against the Catholic Bishop, as Brother Brouillette's employer.

Section 3 of the Act provides that the employer of a psychotherapist or licensed or unlicensed health care professional may be liable under the Act for failing to take action if the employer knows or should know that the employee has engaged in sexual contact with a patient or former patient. 740 ILCS 140/3 (West 2002). As the plaintiff failed to raise a material question of fact as to whether Brother Brouillette was an employee of the Catholic Bishop, summary judgment was correctly granted on count VIII of the fifth amended complaint.

## D. *Breach of Fiduciary Duty*

In count XII of the fifth amended complaint, the plaintiff alleged that the Catholic Bishop violated its fiduciary duty to the plaintiff by covering up Brother Brouillette's past history of sexual misconduct and in failing to protect the plaintiff from sexual contact with Brother Brouillette.

■ In Illinois, a fiduciary relationship is recognized to exist when " 'a special confidence [is] reposed in one who, by reason of such confidence, must act in good faith and with due regard to the interests of the person reposing such confidence.' " *Amato*, 287 Ill. App. 3d at 932, quoting *In re Estate of Osborn*, 128 Ill. App. 3d 453, 455, 470 N.E.2d 1114 (1984). Such a relationship may exist as a matter of law, " 'or it may be the result of a more informal relationship—moral, social, domestic or even personal in its origin.' " *Amato*, 287 Ill. App. 3d at 932, quoting *Estate of Osborn*, 128 Ill. App. 3d at 455.

■ Under Illinois law, a contention that a cleric has breached his duty as a fiduciary is not actionable. *Amato*, 287 Ill. App. 3d at 932. This court explained as follows:

"We believe that when a parishioner lodges such a claim, religion is not 'merely incidental' to a plaintiff's relationship with a defendant, 'it [is] the foundation for it.' [Citation.] The fiduciary relationship is inescapably premised upon the cleric's status as an expert in theological and spiritual matters." *Amato*, 287 Ill. App. 3d at 932, quoting *H.R.B. v. J.L.G.*, 913 S.W.2d 92, 99 (Mo. App. 1995).

In *Amato*, the plaintiff claimed a breach of fiduciary duty where he divulged confidences to the defendant-pastor in reliance on the defendant's representations regarding his training, experience and his " 'commitment to God and religion.' " (Emphasis omitted.) *Amato*, 287 Ill. App. 3d at 932-33. While acknowledging that the defendant would have difficulty in establishing that his conduct in undermining the plaintiff's marriage was religiously motivated, this court "consider[ed] it imprudent for a court to attempt to dissect the secular from the sectarian in this equation" and determined that the plaintiff's relief lay in his other causes of action. *Amato*, 287 Ill. App. 3d at 933.

■ In his complaint, the plaintiff alleged that "THE CHURCH DEFENDANTS as religious and educational associations, are granted special privileges and immunities by society and are in a special relationship with the Plaintiff. Defendants owed Plaintiff the highest duty of trust and confidence and are required to act in the Plaintiff's best interest."[5] As was the case in *Amato*, and as conceded by the Catholic Bishop in this case, church teachings do not sanction Brother Brouillette's conduct toward the plaintiff. However, unlike the negligent hiring and negligent supervision counts, a determination as to whether the Catholic Bishop breached its fiduciary duty to the plaintiff would require an examination of the Catholic Bishop's religious duties to determine if it violated the standard of care.

We conclude that the plaintiff has no cause of action for breach of fiduciary duty in this case.

### E. *Special Relationship*

■ The plaintiff acknowledges that there is no duty to act affirmatively to protect another from a criminal attack absent a special relationship between the parties. *Iseberg v. Gross*, 227 Ill. 2d 78, 87, 879 N.E.2d 278 (2007). Of the four "special relationships" recognized

---

[5]While counts XII and XV are directed at the Catholic Bishop, the plaintiff's reference to "church defendants" appears to include the Christian Brothers as well.

by our courts, the plaintiff relies on the "voluntary custodian-protectee" relationship. See *Doe v. Big Brothers Big Sisters*, 359 Ill. App. 3d 684, 700-01, 834 N.E.2d 913 (2005).

The plaintiff argues that as a teacher, Brother Brouillette stood *in loco parentis* to him and, therefore, took voluntary custody of him. In *Platson v. NSM, America, Inc.*, 322 Ill. App. 3d 138, 748 N.E.2d 1278 (2001), given the lack of Illinois case law on what a voluntary custodian-protectee relationship consisted of, the court cited an Ohio case where the court had observed that "to assume custody of a child is to stand '*in loco parentis* to the child, accepting all the rights and responsibilities that go with that status.' " *Platson*, 322 Ill. App. 3d at 147, quoting *Slagle v. White Castle Systems, Inc.*, 79 Ohio App. 3d 210, 217, 607 N.E.2d 45, 49 (1992). The plaintiff reasons that as Brother Brouillette was the Catholic Bishop's employee and/or agent, the Catholic Bishop is responsible for his acts.

As the plaintiff has failed to establish that Brother Brouillette was employed by or was an agent of the Catholic Bishop, the plaintiff has failed to establish that the Catholic Bishop took custody of the plaintiff. In addition, there is no evidence that the Catholic Bishop had any responsibility for the plaintiff at anytime. See *Doe*, 359 Ill. App. 3d at 702 (parent organization did not assume any of the responsibilities associated with the status of guardian to protect a minor from sexual abuse by an employee of a member affiliate).

Moreover, even if a special relationship exists, no duty to protect against criminal acts will be imposed unless the act was reasonably foreseeable. *Sameer v. Butt*, 343 Ill. App. 3d 78, 86, 796 N.E.2d 1063 (2003). The plaintiff failed to allege sufficient facts to establish that the Catholic Bishop knew of Brother Brouillette's background of pedophilia. Brother Brouillette was a member of the Christian Brothers and, as such, was employed as a teacher/guidance counselor at St. Laurence. The plaintiff alleged facts establishing that the Christian Brothers knew of Brother Brouillette's history of pedophilia. However, it is not disputed that the Catholic Bishop and the Christian Brothers are separate corporations. The plaintiff did not allege sufficient facts establishing how the Catholic Bishop, who did not employ Brother Brouillette or maintain a personnel file on him, knew or should have known of his history. Therefore, the plaintiff has failed to establish that Brother Brouillette's conduct toward the plaintiff was reasonably foreseeable.

We conclude that the Catholic Bishop owed no duty to the plaintiff to protect him from the criminal acts of Brother Brouillette.

### F. *Fraudulent Concealment/Civil Conspiracy*

 The plaintiff maintains that he stated a cause of action for fraudulent concealment. To state a cause of action for fraudulent concealment, the plaintiff was required to plead: " '(1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak [citation]; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury.' " *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH v. Arbor*, 295 Ill. App. 3d 567, 572, 692 N.E.2d 812 (1998), quoting *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 16, 610 N.E.2d 799 (1993). "[I]n Illinois, in order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise [the] duty to speak." *Neptuno Treuhand-Und Verwaltungsgesellschaft MBH*, 295 Ill. App. 3d at 573.

 As set forth above, the plaintiff may not maintain a cause of action against the Catholic Bishop for breach of a fiduciary relationship. *Amato*, 287 Ill. App. 3d at 932. Even assuming that the plaintiff's allegations do not raise a question of religious interpretation, the plaintiff has not established that a fiduciary relationship between the Catholic Bishop and himself existed. The plaintiff pleaded that the Catholic Bishop, along with St. Laurence and the Christian Brothers, controlled Brother Brouillette and that Brother Brouillette was acting within the scope of his employment when he counseled the plaintiff. However, the plaintiff failed to plead any facts establishing that the plaintiff placed his trust and confidence in the Catholic Bishop or that the Catholic Bishop accepted the plaintiff's trust and confidence. See *Hensler v. Busey Bank*, 231 Ill. App. 3d 920, 928, 596 N.E.2d 1269 (1992) (to establish a fiduciary relationship, the trust and confidence allegedly reposed by the first party must actually be accepted by the second party).

Moreover, as explained above, the plaintiff failed to allege facts establishing that the Catholic Bishop knew of or should have known of Brother Brouillette's background of pedophilia. If the Catholic Bishop did not know of Brother Brouillette's history of pedophilia, it could not be said to have concealed it.

■ Finally, the plaintiff maintains that he stated a cause of action for civil conspiracy. "The elements of civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act." *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461 (2004).

■ In count XV, the plaintiff alleged that "THE CHURCH DEFENDANTS, religious and educational associations, including the various schools that employed CHRISTIAN BROTHERS, did individually and as association entities in concert knowingly and willfully enter[ed] into a conspiracy with the agreed purpose to defraud, by their concealment and suppression of the facts known to them and notice of BROTHER BROUILLETTE'S history of pederasty, pedophilia, and sexual contact with minors, as well as the danger BROUILLETTE posed to children, including Plaintiff, and BROUILLETTE'S lack of suitability to be a CHRISTIAN BROTHER and/or to have contact of any kind with children."

As noted above, the plaintiff failed to allege sufficient facts establishing that the Catholic Bishop knew or had any reason to know of Brother Brouillette's past history of sexual improprieties with minors. Participation in the common scheme must be knowing and voluntary. *Redelmann v. Claire-Sprayway, Inc.*, 375 Ill. App. 3d 912, 924, 874 N.E.2d 230 (2007). Without the knowledge of Brother Brouillette's past history, the Catholic Bishop could not have entered into an agreement knowingly and voluntarily to suppress it.

We conclude that the plaintiff has failed to state causes of action for fraudulent concealment and civil conspiracy.

### III. Conclusion

As the order granting summary judgment to the Catholic Bishop was proper, we affirm the judgment of the circuit court.

Affirmed.

WOLFSON and GARCIA, JJ., concur.